DAVID A. HUBBERT
Deputy Assistant Attorney General

JAMES E. WEAVER
ADAIR F. BOROUGHS
Trial Attorneys
U.S. Department of Justice, Tax Division
555 4th Street, N.W.
Washington, D.C. 20001
Tel. (202) 305-4929
Fax. (202) 307-0054
E-mail: James.E.Weaver@usdoj.gov
E-mail: Adair.F.Boroughs@usdoj.gov

MELINDA L. HAAG (CaSBN 132612)
United States Attorney
*Of Counsel*
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# (SAN FRANCISCO DIVISION)

| | |
|---|---|
| SHASTA STRATEGIC INVESTMENT FUND, LLC; AND PRESIDIO GROWTH LLC (Tax Matters Partner),<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CASE NO. C-04-4264_RS<br><br>Related to Case Nos. C-04-4309-RS, C-04-4398-RS, C-04-4964-RS, C-05-1123-RS, C-05-1996-RS, C-05-2835-RS, and C-05-3887-RS<br><br>**DECLARATION OF DOMENICK DEGIORGIO IN SUPPORT OF RESPONDENT'S OMNIBUS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date: April 25, 2013<br>Time: 1:30 p.m.<br>Judge: Richard Seeborg<br>Place: Courtroom 3, 17th Floor |

9725711.1

I, Domenick DeGiorgio, declare:

1. I presently reside in Cold Spring Harbor, New York.

2. I graduated from the University of Buffalo in 1984 where I majored in accounting and finance.

3. After college, I worked for two accounting firms and a large brokerage house over a period of about six years.

4. During that time, I became a licensed certified public accountant.

5. In 1990, I went to work for the New York office of a German bank that, through a series of transactions, became known as HypoVereinsbank or "HVB" for short.

6. Over time, my responsibilities at HVB increased. In 1999, I became the co-head of a new group within HVB known as the Financial Engineering Group. The Financial Engineering Group generated structured financing transactions and/or products for the bank's corporate customers.

7. Sometime around August 1999, Robert Pfaff called me about a banking opportunity associated with a new product that his advisory firm, Presidio, had developed. I came to learn that this product was referred to by the acronym "BLIPS." I knew Mr. Pfaff from work that we had done in connection with earlier tax-advantaged transactions.

8. Mr. Pfaff indicated that this product had been created by Presidio, alongside KPMG LLP ("KPMG") and Deutsche Bank and that the product was being marketed to high net worth clients of KPMG. That product involved an investment strategy that required the use of a loan. Mr. Pfaff asked me if HVB would be interested in participating as a lender.

9. Mr. Pfaff also indicated that there was a tight time constraint associated with the product. Loans would need to be funded sometime in October 1999.

1

9725711.1

10. Mr. Pfaff indicated that Deutsche Bank had done a little over a billion dollars of these transactions and that he was pretty confident, given the time constraints, that Deutsche Bank would be agreeable to sharing a set of the transactional documents associated with the product.

11. After conferring with my colleagues and further discussions, I arranged for Mr. Pfaff and another individual with Presidio, David Amir Makov, to make a formal presentation to HVB in early September 1999 regarding the BLIPS product. Because of the very tight time frame involved, I worked to accelerate the internal approval process at HVB.

12. At the September 1999 presentation meeting in New York, Mr. Pfaff provided a pretty detailed description of BLIPS.

13. Using a white board, he laid out in a flow chart form the various entities and parties involved in the BLIPS transaction. He laid out the flow of the loan proceeds along with the investment that the clients were to make into the transaction.

14. That flow, as I recall it, took the form of a series of steps. A high net worth client would establish account and credit relationships with HVB. HVB would then advance loan proceeds to the client's limited liability company (I use the abbreviation "LLC-1" herein) established for the purpose of the BLIPS program. Although the funds were to be loaned by HVB to the LLC-1 on a nonrecourse basis, all of the advances made on the HVB loan were pledged back to HVB as collateral for the loan, and the credit agreement executed by the borrower contained strict and extensive restrictions on how the funds could be invested. Moreover, the funds (or any ensuing investments) were to be maintained in accounts with HVB at all times.

15. The required loan structure described by Mr. Pfaff was unusual, at least for HVB. The loan was a "premium loan," with a high fixed rate of interest. By this I mean that, at the outset of the transaction, the bank advanced a principal amount, and, in addition to the principal

2

9725711.1

amount, the bank also advanced a premium amount in recognition of the above-market rate at which interest was to accrue. The premium loan carried a term of seven years. I refer to a specific example of how this worked, below.

16. The client also deposited his or her own funds, in an amount of 7% of the premium amount, into the LLC-1 account with HVB. I recall that Mr. Pfaff (at the September 1999 meeting) characterized this 7% as the cost of the program to the client.

17. Mr. Pfaff indicated that HVB, along with other parties, could be expected to be compensated out of this 7% in the form of an interest margin and up-front fees.

18. As Mr. Pfaff described it, the funds deposited in the LLC-1 would then, within a relative short period of time, be contributed to an investment fund managed by Presidio ("LLC-2"). The LLC-2 also established an account and credit relationship with HVB.

19. At the same time that the funds moved from LLC-1 into LLC-2, the LLC-2 assumed the obligations associated with the premium loan. The same pledge and restrictions on the use of the funds carried over to the LLC-2. Again, the funds (or any investments made with the funds) were to remain within HVB.

20. During the presentation to HVB in September 1999, Mr. Makov described the investment strategy that Presidio associated with BLIPS.

21. As for the loan's premium structure, Mr. Makov said it helped mitigate the interest rate risk that the client would be subject to and that he said was inherent in the investment strategy.

22. Mr. Makov said that the purpose of the premium loan itself was to provide leverage for the client to execute the investment strategy.

23. Mr. Makov described a strategy where the funds in the LLC-2 would be utilized for foreign currency investments, although it was pretty clear from what was said during the

9725711.1

presentation that the restrictions on the loaned funds would preclude such a purpose from being achieved during the first sixty-day phase of the transaction.

24. He referred to foreign currencies that were pegged to the U.S. Dollar and a plan to profit if those currencies broke loose from their pegs and devalued.

25. Although BLIPS was presented as a seven-year deal, Presidio indicated that the investment structure of the program was divided into three components.

26. The first phase of the program was to last for 60 days.

27. The second phase was to last an additional 120 days.

28. The third phase was to last for the remaining six and one-half years of the seven year program.

29. It was pretty evident to me from the flow of funds diagrammed by Mr. Pfaff (during the September 1999 meeting) that the loan proceeds (principal and premium amounts) were not being used to implement the first phase of the program.

30. Mr. Pfaff indicated that the client would enjoy a tax benefit from the BLIPS transaction that was somehow tied to the premium loan.

31. After the September 1999 meeting, I obtained requisite internal approvals at HVB to move forward with the BLIPS program.

32. During September 1999, I met two individuals with Deutsche Bank, Bill Boyle and John Rolfes. Deutsche Bank ended up authorizing the law firm of Shearman and Sterling to share Deutsche Bank's transactional documents for the BLIPS program with us so that we could expedite implementation of the program at HVB.

33. Prior to HVB funding the loans in mid and late October 1999, I had a follow up meeting in San Francisco that included Mr. Pfaff and Mr. Makov of Presidio. Also in attendance were

9725711.1

Randall Bickham of KPMG and an attorney, Doug McFadden (I'm not sure about the spelling of his name), from Shearman and Sterling.

34. At the meeting, Mr. Bickham went through a presentation of the BLIPS transaction.

35. After Mr. Bickham's presentation concluded, the Shearman attorney, Mr. McFadden, indicated that he did not think that the transaction (as structured) worked.

36. I observed that Mr. Bickham, Mr. Pfaff and Mr. Makov did not appear concerned about what Mr. McFadden said.

37. As HVB geared up to participate as a lender in the BLIPS program, I was concerned about the required timing of the program in 1999. HVB's "know your customer" requirement associated with a customer, and a special purpose vehicle (here the LLC-1) to be utilized by a client, was time consuming.

38. I spoke about this with Mr. Pfaff and he indicated that he would see if KPMG could allocate some resources to help with this processing. As a result, two or three folks from KPMG essentially camped out in HVB's offices to facilitate the processing of HVB's know-your-customer requirements.

39. I attach a copy of Exhibit B-280 hereto. I spoke about this exhibit during my testimony during the criminal trial captioned *United States v. Larson*, et al., No. 05-CR-888 (S.D. NY).

40. Exhibit B-280 is an internal HVB credit request form that prepared in connection with the process for obtaining approval to fund HVB loans associated with the BLIPS program for 1999. My signature appears on page 12 of Exhibit B-280.

41. Although the document is a little hard to read, on the first page the credit request applied for indicates a period of 60 days. Even though the BLIPS loan was for a seven-year term, we

9725711.1

expected, based on our discussions with Presidio, the BLIPS transactions to unwind after the first 60-day phase of the program.

42. Further down on the first page of Exhibit B-280, the document states that the purpose of the loans is to finance the investment activities of the LLCs. Although we included this language in the request, the loaned funds (principal and premium) advanced by HVB in the BLIPS program were not, in fact, used to finance the contemplated investment activities of the LLC-2s as articulated by Mr. Makov.

43. Also on the first page of Exhibit B-280, there is reference to a "plafond" of an additional $950 million. What that means is, in addition to the $53 million requested in the form, we were also going to request a credit limit of an additional $950 million to fund additional loans to clients as part of the very same BLIPS program.

44. On page 2 of Exhibit B-280, we indicated that the proceeds associated with the proposed BLIPS program loan were to be used as leverage for the investment strategy. We knew that this was not the case, but we inserted the language into the request in order to create the perception that there was a purpose for the loan.

45. We did observe, at the top of page 2 of Exhibit B-280, that "we enjoy the possibility of earning an infinite ROE [return on equity] on these loans . . . ." By that, we meant that, because the money we were lending would never leave HVB and would be invested in cash equivalents for the first sixty days, we did not need to, for regulatory purposes, allocate capital on the bank's balance sheet to these types of loans.

46. On page 3 of Exhibit B-280, we indicated that HVB would be protected in our documentation through a minimum overcollateralization ratio of 1.0125 to 1 at all times and that violation of this ratio would trigger immediate acceleration under the loan agreements without

9725711.1

notice. By that we meant that the assets of the borrower pledged back to the bank actually had to exceed the amount advanced by HVB by that ratio.

47. Also on page 3 of Exhibit B-280, we indicated that the LLCs would enter into interest rate swaps. Those swaps involved agreements between Presidio (on behalf of the LLC-2s) and HVB, whereby the high fixed rate interest obligations owed under the loan were exchanged for floating rate interest obligations computed on the full amount advanced by HVB at the outset of a BLIPS transaction (principal plus premium amounts). The final payment on the swap was computed to repay the loan premium advanced by HVB.

48. As we noted on page 3 of Exhibit B-280, if the loan was prepaid and the swap terminated at the same time, "the algebraic sum of prepayment amount, swap termination payment, and swap additional amount, if any, will equal the amount advanced." What this meant is that the swap agreement, combined with the premium loan, transformed the premium loan into what was economically a simple floating rate loan for the full amount advanced (principal plus premium).

49. Prior to funding BLIPS loans, I received a copy of a KPMG draft opinion letter regarding the BLIPS transaction from Mr. Pfaff.

50. After the submission of the credit request, HVB gave the Financial Engineering Group a green light to move forward with the BLIPS program in 1999. I recall that HVB funded approximately 10-11 BLIPS transactions during 1999.

51. I, along with Richard Pankuch, oversaw the implementation of the BLIPS program at HVB in 1999.

52. I attach a copy of Exhibit B-279 hereto. I also spoke about this exhibit during my testimony during the criminal trial captioned *United States v. Larson*, et al., No. 05-CR-888 (S.D. NY).

7

9725711.1

53. Exhibit B-279 is an internal HVB credit request form that we prepared in connection with funding additional HVB loans associated with the BLIPS program for 2000. Although it is unsigned, I recognize it as an HVB business record that was most likely prepared by my former colleague, Richard Pankuch at HVB.

54. The period "applied for" in Exhibit B-279 was shown as six months, because we were told by Mr. Pfaff that BLIPS deals would be presented to HVB over a six-month period, during which the loans would be funded and then terminated.

55. HVB approved the funding of additional BLIP program loans for 2000.

56. I also attach a copy of Exhibit B-374, which was our request for an additional credit ceiling for the BLIPS program during 2000 of $500 million. Again, I recognize it as an HVB business record.

57. I recall that HVB funded approximately 18 BLIPS transactions during 2000.

58. I, along with Richard Pankuch, oversaw the implementation of the BLIPS program at HVB in 2000.

59. Presidio was a counterparty on the swap agreements between LLC-2s and HVB that would be entered into at the time that the LLC-2s assumed obligations of the premium loans associated with their respective BLIPS transactions.

60. As I noted above, the funds advanced by HVB in the various BLIPS transactions that I oversaw were not used for the investment purposes outlined by Mr. Makov: taking investment positions with respect to foreign currencies.

61. Instead, Presidio and HVB were counterparties to a series of spot and short term forward trades involving euros and dollars that largely offset each other. I understood that the net effect of these transactions was to earn a very small (virtually riskless) short term rate of interest for the

9725711.1

1  respective LLC-2s – a rate which would have been less than the rate of interest owed by the
2  LLC-2s under their respective swap agreements.

3  62. Presidio (on behalf of LLC-2s) and HVB would also enter into forward contracts for future delivery of Argentine Pesos and Hong Kong Dollars. (I recall a few instances where another currency may have been utilized in trading.) The LLC-2s was the selling party under these contracts, meaning that Presidio would profit if the currencies devalued; however, these contracts had very little value because the Argentine Peso and Hong Kong Dollar were pegged to the U.S. Dollar, and the chances of one of the currencies breaking away from its peg during a sixty-day time period was considered remote by HVB. These forward contracts were not funded with, or supported by, HVB loan proceeds.

63. By way of illustrating one of the BLIPS transactions funded by HVB, I attach some of the transactional documents associated with the Presidio-managed Wilson Strategic Investment Fund (an LLC-2).

64. I recognize the premium loan made to Minnesota Ventures, LLC (a special use vehicle owned by client Bruce Rank) ("Minnesota Ventures") by reference to a Promissory Note (Ex. 1) and Credit Agreement (Ex. 2) between HVB and Minnesota Ventures, copies of which are attached hereto. I recognize my signature on Bates page 10-00037 of the Credit Agreement. I oversaw this transaction.

65. In connection with this transaction, I also attach copies of a Pledge and Security Agreement (Ex. 3) and Account and Control Agreement (Decl. Ex. 4) between the LLC-1s and HVB. I recognize my signature on Bates page 10-00149 of Exhibit 3 and on Bates page 10-00157 of Exhibit 4.

9725711.1

66. In this particular BLIPS transaction, the principal amount was $56.7 million. (Ex. 1). The additional loan premium advanced was $34 million. (Ex. 2 at bates page 10-00010 (termed the "initial unamortized premium amount")). The sum of these two amounts, $90.7 million, would be the amount advanced to the three LLC-1s in this BLIPS transaction. (Ex. 2 at page 10-00015).

67. The above-market interest rate on the premium loan is not stated in the Promissory Note or Credit Agreement. That rate was determined at the time that the LLC-2 (here the Wilson Strategic Investment Fund) ("Wilson") assumed the loan obligation and a swap agreement (described below) was executed by Wilson and HVB.

68. The overcollateralization ratio of 1.0125 to 1.00 is reflected on Bates page 10-00032 of Ex. 2.

69. In this transaction, Wilson assumed the obligations of Minnesota Ventures. I also attach as Ex. 5 hereto the Assignment and Assumption Agreement for Wilson that I signed on behalf of HVB. (*See* Bates page 10-00290). This agreement reflects the assumption of the obligations under the premium loan reflected in Ex. 1 and Ex. 2 by Wilson. The agreement is dated as of October 27, 1999.

70. At the same time that Wilson assumed the premium loan, Wilson and HVB would have entered into an interest rate swap agreement whereby Wilson swapped its obligation to pay a fixed rate of interest (17.695% on $56.7) for a floating rate obligation (5.40875% on $90.7 million). I believe that Ex. 6 is a copy of such an agreement between Wilson and HVB because I generally recognize the signature of Steven Buss of Presidio (whose signature appeared on numerous BLIPS-related documents), and I recognize the names of the signatories for HVB.

9725711.1

Moreover, I recognize this as a standard agreement associated with each BLIPS transaction funded by HVB.

71. As I mentioned above, the swap agreement transformed, in combination with the premium loan, from an economic standpoint, the premium loan into an ordinary floating rate loan on a principal balance of $90.7 million.

72. In all of the BLIPS transactions that I oversaw, Presidio and HVB would have entered into spot and short-term forward trades involving euros and dollars that largely offset each other (similar to the ones attached as Ex. 7 and Ex. 8 hereto) during the sixty-day duration of the transaction. None of the funds advanced by HVB in connection with the loans made by HVB in the BLIPS program were utilized in connection with any real foreign currency positions associated with currencies pegged to the U.S. Dollar.

73. As I mentioned above, Presidio did enter into forward contracts to sell Argentine Pesos, Hong Kong Dollars with HVB; however, any such positions were anticipated to be closed out within sixty days and did not involve the use of loaned funds. I believe the form of such contracts is reflected in the confirmation attached hereto as Ex. 9, which reflects a forward contract for Argentine Pesos. Again, because the Argentine Peso was pegged to the U.S. Dollar, HVB viewed this contract as having little value, notwithstanding its face amount.

74. On August 11, 2005, I pled guilty in the United States District Court for the Southern District of New York to four felony charges associated with my involvement in the BLIPS program: two conspiracy charges, one wire fraud charge, and one tax evasion charge.

75. I knew that the seven-year terms of the BLIPS transactions (and the seven-year loan documents) were a fiction. With possibly one exception, I do not recall any of the BLIPS transactions funded by HVB that I supervised went beyond the first 60 days.

9725711.1

76. In addition, I did not see a purpose behind the premium loan other than to create a tax benefit for the investor.

77. Moreover, I was aware that parts of the draft KPMG opinion letter that I received from Mr. Pfaff were inconsistent with what actually occurred at HVB with respect to the BLIPS transactions. I understood that, contrary to Mr. Makov's investment thesis, the premium loan was not used to leverage investments in foreign currency transactions, and the structure of the financing did not provide any investment benefit to the investing client because the premium loan was immediately negated through the swap arrangement upon the funding of LLC-2 entities purporting to invest in foreign currencies.

78. Although I entered into a cooperation agreement with the United States, I believe that my obligations under that agreement have expired, and I am making this declaration of my own volition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of March 2013.

_____
Domenick DeGiorgio

9725711.1