Pages 1 - 44

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | |
|---|---|
| SHASTA STRATEGIC INVESTMENT ) | |
| FUND, LLC; and PRESIDIO GROWTH ) | |
| LLC (Tax Matters Partners), et ) | |
| al., ) | |
| ) | NO. C 04-04264 RS |
| Petitioners, ) | |
| ) | AND RELATED CASES: |
| VS. ) | C 04-04309 RS, 04-04398 RS, |
| ) | 04-04964 RS, 05-01123 RS, |
| ) | 05-01996 RS, 05-02835 RS, |
| ) | and 05-03887 RS |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |
| _____) | |

San Francisco, California
Thursday, June 20, 2013

### TRANSCRIPT OF PROCEEDINGS

APPEARANCES:
For Petitioners:

                    LATHAM & WATKINS
                    505 Montgomery Street - Suite 1900
                    San Francisco, California  94111
               BY:  STEVEN M. BAUER, ATTORNEY AT LAW


For Respondent:

                    U.S. DEPARTMENT OF JUSTICE
                    Tax Division
                    555 Fourth St., N.W. - Room 7217
                    Washington, D.C.  20001
               BY:  JAMES E. WEAVER, TRIAL ATTORNEY
                    ADAM D. STRAIT, TRIAL ATTORNEY
                    ADAIR F. BOROUGHS, TRIAL ATTORNEY


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:   (CONTINUED)

 2   For Intervenors J. Paul Reddam and Clarence Ventures LLC:
                          LAW OFFICE OF DAVID W. WIECHERT
 3                        115 Avenida Miramar
                          San Clemente, California  92672
 4               BY:  DAVID W. WIECHERT, ATTORNEY AT LAW
                      JESSICA C. MUNK, ATTORNEY AT LAW
 5
     For Intervenors Thomas Gonzales and Birch Ventures LLC:
 6                        WOOD LLP
                          333 Sacramento Street
 7                        San Francisco, California  94111
                 BY:  DASHIELL C. SHAPIRO, ATTORNEY AT LAW
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **Thursday - June 20, 2013**                        **3:32 p.m.**

2                          **P R O C E E D I N G S**

3                            **---000---**

4        **THE CLERK:**  Calling case C 04-4264, and all related

5    matters, Shasta Strategic Investment Fund versus United States

6    of America.

7        Counsel, please state your appearances.

8        **MR. BAUER:**  Good afternoon, Your Honor.  Steve Bauer

9    for the various Strategic Investment Funds.

10        **THE COURT:**  Good afternoon.

11        **MS. MUNK:**  And good afternoon, Your Honor.  Jessica

12    Munk and David Wiechert on behalf of intervenors J. Paul Reddam

13    and Clarence Ventures LLC.

14        **THE COURT:**  Good afternoon.

15        **MR. SHAPIRO:**  Your Honor, Dashiell Shapiro on behalf

16    of Tom Gonzales and Birch Ventures LLC, intervenors.

17        **THE COURT:**  Good afternoon.

18        **MR. WEAVER:**  Good afternoon, Your Honor.  James

19    Weaver, Adam Strait, and Adair Boroughs on behalf of the

20    United States.

21        **THE COURT:**  Good afternoon.

22        This matter is on my calendar for a motion for summary

23    judgment by the respondent, the Government; and also the

24    various motions by the intervenors, various groups, with

25    respect to the procedural question to abbreviated tolling

1    agreements in this matter.

2        As I generally do, let me go ahead and give you my sense

3    of where I see things having had an opportunity to go through

4    the voluminous submissions that I did receive, which I

5    appreciate.

6        As I understand it, this motion pertains, let's talk about

7    the summary judgment motion first, pertains to the petitions

8    that were filed by Presidio Growth as the Tax Matters Partner

9    contesting the FPAAs that were issued to I guess it's around 91

10   different partnerships, and it arises out of this extremely

11   convoluted investment strategy known as BLIPS.

12       I have now navigated through the extensive submitted

13   materials, and I have to say I'm inclined to grant the

14   Government's motion.

15       I think the undisputed facts do not reflect that these

16   transactions were foreign currency exchange investments that

17   were seeking to achieve a profit over their seven-year life;

18   but instead they were effectively a 60-day strategy that lacked

19   economic substance, and it was designed artificially to inflate

20   a participant's tax basis utilizing primarily this premium loan

21   component but other aspects as well, and the overriding purpose

22   was to generate tax losses.

23       With respect to the intervenors' motions, they are,

24   putting them together, directed to, and I realize there are

25   individual aspects to the various intervenors, but they go to

1   the question of authority to enter into tolling agreements; and

2   that to the extent that those are not valid, that there is then

3   statute of limitations issues that arise.

4        To put them together, I have to say I know that the

5   arguments are various conflict-of-interest problems. I don't

6   think those win the day. I think the agreements are effective

7   and valid; and that, therefore, the motions, some of them are

8   in the form of summary judgment motions, some of them are in

9   the form of opposition to the Government's motion for summary

10  judgment, but the intervenors' positions I don't think -- the

11  various intervenors, my initial read at least is that those

12  positions are not well taken.

13       So I'll look to the plaintiffs' side and the intervenors'

14  side to start. Why don't we start with the intervenors'

15  motions because those are a little clearer.

16       I will tell you also that I have to conclude these

17  proceedings, because I have a conference call that I have to

18  participate in, at 4:20. So it cannot go longer than that, and

19  I hope it will be less than that.

20       So the intervenors' counsel can begin.

21       **MS. MUNK:** Good afternoon, Your Honor. Jessica Munk

22  on behalf of intervenors J. Paul Reddam and Clarence Ventures

23  LLC.

24            **THE COURT:** Good afternoon.

25       **MS. MUNK:** I'm going to be addressing the Presidio

1  Growth extensions, the Tax Matter Partner extensions.

2  Mr. Wiechert is going to address Mr. Reddam's individual

3  extension.  I will be addressing the conflict of interest

4  argument, as well as Alan Smith's lack of authority to sign for

5  Foraker and Logan, which is the other intervenor in this case;

6  and Mr. Shapiro is going to be addressing the remaining issues

7  regarding the invalidity of the Tax Matter Partner extensions,

8  and the various briefing he cited on that, and we're joining in

9  those arguments that Mr. Shapiro filed.

10       First, Your Honor, there are two additional exhibits that

11  I wanted to admit that I have given to the Government.  They're

12  documents that we received after we filed our reply brief from

13  the Government on, I believe it was, the end of May.  So I have

14  them labeled as Exhibits 54 and 55.  I have given them to the

15  Government.  I don't believe they have an objection, but if I

16  can hand them up for Your Honor.

17            **THE COURT:**  Okay.

18            **MR. WEAVER:**  No objection.

19                      (Pause in proceedings.)

20            **THE COURT:**  Okay.

21            **MS. MUNK:**  The statute of limitations for assessments

22  attributable to partnership items is three years after the

23  later date from filing of the partnership return or the last

24  day for filing such a return.

25       Now, Mr. Reddam's partner was Foraker -- BLIPS'

1    partnership was Foraker Strategic Investment Fund.  I'll refer

2    to it as Foraker.

3        Foraker filed its partnership return for the taxable year

4    1999 on April 13th, 2000.  Now, the statute of limitations for

5    assessments against Foraker expired on April 15th, 2003.

6    Absent a valid extension to the three-year limitations period,

7    the FPAA issue to Presidio Growth on December 21st, 2004, is

8    untimely.

9        Now, generally a Tax Matter Partner may enter into an

10   agreement with the IRS to extend the limitations period and

11   that extension is binding on all the parties unless the Tax

12   Matter Partner has a conflict of interest.

13       Now, in 1997, John Larson and Robert Pfaff left KPMG to

14   form Presidio Advisory Services.  They did so in order to

15   implement KPMG investment strategies that they helped develop.

16       **THE COURT:**  Now, Mr. Reddam himself signs the consent;

17   correct?

18       **MS. MUNK:**  He does, Your Honor.

19       **THE COURT:**  So that's different than the *Transpac*

20   case, which is one of the ones that seem to be the principal

21   case on which you rely.

22       **MS. MUNK:**  It is different, Your Honor, but we also

23   have challenges to Mr. Reddam's -- the validity of Mr. Reddam's

24   extension, and we believe that extension is also invalid.

25       **THE COURT:**  Why?

1      **MS. MUNK:**  Based on the conflict of interest given the

2   fact that Mr. Hastings, who is a representative of KPMG and

3   directly involved for implementing, marketing, selling BLIPS to

4   various people, that he had a conflict of interest.  The

5   Government was criminally investigating KPMG for what they

6   believed was the largest tax shelter fraud case ever.

7      **THE COURT:**  So everybody is -- these conflicts are

8   floating out there because Mr. Reddam is, you know, getting

9   advice and counsel from people that otherwise would have a

10  reason to be concerned because the Government is investigating.

11  He has no response -- once -- so, therefore, when he signs, we

12  just disregard it?

13     **MS. MUNK:**  Well, Your Honor, when he signs, we don't

14  disregard it, but what we do is we look at who's representing

15  Mr. Reddam at that point.  And I know Mr. Wiechert wanted to

16  mainly address this argument, but I can touch on it if this

17  is -- briefly and let him address it some more.

18     **THE COURT:**  Go ahead.

19     **MS. MUNK:**  But KPMG was being investigated by the IRS

20  and the Federal Government for -- it was basically conducting a

21  criminal investigation.  We know that the Criminal

22  Investigation Division of the IRS was investigating this case

23  and made a criminal referral to the Department of Justice.

24     **THE COURT:**  Right.

25     **MS. MUNK:**  They were scrutinizing everything KPMG did,

1  and they believed that KPMG had essentially committed criminal

2  tax fraud.  So the fact that the IRS is accepting waivers or

3  statute of limitation extensions from the very entity, KPMG,

4  that they believe has committed fraud, there's clearly a

5  conflict of interest.

6      And while this is different from *Transpac*, I think the

7  reasoning in *Transpac* still applies to our case.

8          THE COURT:  Okay.  Go ahead.

9          MS. MUNK:  Do you want me to -- I can continue on this

10  point or I can go back to the --

11          THE COURT:  Go back to your other argument.

12          MS. MUNK:  Because we recognize that there are the two

13  extensions that you need to look at.  I do believe the

14  Government wants to only look at the individual taxpayer

15  extensions and Mr. Reddam's extension; but I think as a

16  fallback, they do want to look at the Tax Matter Partner

17  extensions from Presidio Growth.

18      So in 1999, just to give some brief history of this,

19  Mr. Larson and Mr. Pfaff, along with David Amir Makov --

20          THE COURT:  I did read the historical information.

21          MS. MUNK:  Okay.

22          THE COURT:  So that you need not go over with me

23  again.  I know what happened in terms of the criminal charges

24  and where that played itself out, Mr. Larson, Mr. Pfaff, and

25  the like.

1   **MS. MUNK:**  Okay, Your Honor.  And I also -- and I

2   don't know if the Government is challenging this or not,

3   although they did in their papers, but there was an argument

4   that they raised that essentially because Mr. Larson didn't

5   sign for Presidio or Mr. Pfaff didn't sign for Presidio, then

6   there's no conflict.

7       We disagree with that, Your Honor.  Presidio itself was

8   being investigated as well because that was the various

9   entities that Mr. Larson and Mr. Pfaff ended up forming to

10  implement these various --

11      **THE COURT:**  What's the case authority for the prospect

12  that because there may have been an investigation going on with

13  respect to Presidio that, therefore, there's a disabling

14  conflict for purposes of their signing such that it binds the

15  partners?

16      **MS. MUNK:**  Well, I think that's the -- I mean, that's

17  the *Transpac* case, Your Honor.

18      **THE COURT:**  Okay, that's *Transpac* again.  Okay.

19      **MS. MUNK:**  I think it's absolutely *Transpac*.  Presidio

20  and KPMG are being investigated by the IRS and they're being

21  criminally investigated.  We know the whistle-blower contacts

22  the Federal Government in 2002 that summer; and then in around

23  October 2002, the Senate launches its investigation into these

24  various what they consider tax shelters.

25      And it's in March 2003, at that point the IRS realizes

1    they're up against the statute of limitations deadline and it's

2    about to expire, and they seek statute extensions from Presidio

3    Growth, the very entity that they're investigating that they

4    believe has engaged in criminal conduct.

5         And when you look at *Transpac*, that was the issue.

6    There -- it's very similar.  While there might be a few

7    distinctions, it is very similar because there the IRS started

8    doing civil audits of the Transpac partnerships.  It, just like

9    here, turned into a criminal investigation; and just like here,

10   we have several of the Tax Matter Partners who are being

11   criminally investigated.

12        Well, we know the Tax Matter Partner Presidio was being

13   investigated and its principals have been convicted.  So it's

14   very similar, Your Honor.

15        And the Government knew that there was a conflict of

16   interest.  And here we believe the Government did know that

17   there was a conflict of interest.  They knew that Presidio and

18   KPMG had what they believed to have engaged in criminal

19   conduct, but they still accepted extensions from Presidio

20   Growth; and we believe that based on this conflict of interest,

21   it's invalid.

22             **THE COURT:**  Okay.

23             **MS. MUNK:**  One other point I wanted to highlight is

24   that in the *Leatherstocking* case, which is also a Second

25   Circuit opinion, there is some language in there that says that

1    the IRS may have -- I'm sorry, I'm trying to think how it's

2    worded; but essentially that when the IRS knew the Tax Matter

3    Partner was defrauding the limited partners, that may be enough

4    to put the IRS on notice.

5        And I think that language is very persuasive because if

6    you look here, the IRS had issued numerous summonses to KPMG.

7    Mr. Larson had responded to numerous summonses.  They had tons

8    of documentation on BLIPS.

9        We know the criminal investigation unit of the IRS is

10   investigating; and at that point in 2003, which is over a year

11   after the investigation, they believed that Presidio, the Tax

12   Matter Partner, was engaged in fraudulent tax shelters.  That's

13   what the IRS believed.

14       So that was enough to put the IRS on notice that when they

15   get extensions from the Tax Matter Partner, Presidio Growth,

16   that are going to bind the limited partners, there is a

17   conflict of interest.  And I think *Transpac* and *Leatherstocking*

18   are directly on point with regards to that, Your Honor.

19       I was also going to address Mr. Smith, Alan Smith is one

20   that signs on behalf of Presidio, his lack of authority to

21   sign.

22           **THE COURT:**  Okay.

23           **MS. MUNK:**  Again, I think in the briefing I go through

24   pretty clearly the history of who actually is controlling this

25   company.

1    I believe that the IRS knew that Mr. Larson and Mr. Pfaff

2    are controlling it; but regardless, when you look at the

3    documents, Alan Smith essentially appears out of nowhere.  I

4    don't see in the record of the documents we've been given from

5    the Government that there's actually a document that shows

6    Odd Eckholt, that was supposedly the director of HSM Growth

7    Holdings, was actually the director.

8        The documents have Mr. Larson and Mr. Pfaff all over them.

9    The records of incorporation and the corporate filings have

10   Mr. Pfaff and Mr. Larson.

11       One of the documents, Exhibit 55 that I handed up,

12   Your Honor, is a document from I believe it's October 2002, and

13   it's a document that the IRS had looked at when they were

14   trying to determine who essentially is in control of these

15   companies, and it lists Robert Pfaff as the president as late

16   as 2002; and this is at the same time that the IRS is seeking

17   to get extensions from Presidio Growth.

18       So based on all of that, I know Mr. Shapiro wants to

19   address the additional issues and as well he's going to address

20   the single-member conversion that the Tax Matter Partner

21   converted to a single member and was no longer the Tax Matter

22   Partner.

23           **THE COURT:**  Okay.

24           **MS. MUNK:**  And Mr. Wiechert was also going to address

25   Mr. Reddam's individual extension, Your Honor.  Thank you.

1    **THE COURT:**  All right.  Mr. Shapiro, and then we'll

2  get to the Government.

3    **MR. WEAVER:**  Your Honor, is there any way we can go

4  issue by issue since --

5    **THE COURT:**  Generally I like to do that, but let's

6  get -- I would rather have -- it's really a limited amount of

7  time.

8    **MR. WEAVER:**  Okay.

9    **THE COURT:**  And I want to move it in this fashion so

10  we can get everybody an opportunity to say what they want to

11  say.

12    Go ahead.

13    **MR. SHAPIRO:**  Thank you, Your Honor.

14    I'll try to briefly identify, I think, the key issues on

15  the statute, both the factual and legal issues, as to why the

16  Government should not prevail here.

17    First is the conversion to single-member LLC.  I think

18  it's clear from the internal documents we've submitted, there's

19  internal IRS memoranda we cite to in our brief, that the IRS

20  had identified this as a significant litigating hazard; that if

21  the TMP converts from a partnership to a single-member LLC, it

22  terminates the status of the TMP and it can't sign consents on

23  behalf of the partnership, it can't receive the FPAA notice.

24  And this is significant because then the statute was never

25  tolled with the issuance of the notice.

1        The Government tries to make a distinction between a

2   termination of a partnership and a liquidation or a

3   dissolution, and that no such distinction can be made.  There's

4   a specific revenue ruling on point, Revenue Ruling 99-6, which

5   says that when a partnership converts to a single-member LLC,

6   it's a termination that's also a liquidation.

7        Now, the regulations, the Tax Matter Partner regulations,

8   under 6231 make it very clear that if the entity liquidates,

9   that terminates its status as a TMP.  It can't act on behalf of

10  the partnership.

11            THE COURT:  So nobody could ever sign for that?

12            MR. SHAPIRO:  No, that's --

13            THE COURT:  There's no way you can consent?

14            MR. SHAPIRO:  No, that's not true.  There's a

15  procedure in the 6231 rights for the Government to designate a

16  new entity as a Tax Matters Partner, and that's what should

17  have been done here.

18       The Government had actual knowledge that Presidio had

19  converted to a single-member LLC.  There's correspondence that

20  the Government knew of this from Revenue Agent Diaz that we

21  cite to in our brief.  The Government had actual knowledge of

22  this; and because they had actual knowledge, I'm going to get

23  to it in a minute, the actual knowledge of the Government as to

24  the defects in the TMP status affect the question of whether

25  the statute was tolled.

1        Moreover, there's a case, *Roundhorse versus Commissioner*,

2   119 T.C. 157, it's a Tax Court case saying that the IRS can't

3   litigate contrary positions taken in a revenue ruling.  So the

4   IRS can't stand up and try to argue that this wasn't a

5   dissolution of the TMP for tax purposes.  When a partnership

6   converts to a single-member LLC, its status is terminated.

7        And this is very significant for tolling because the IRS

8   cites to the Ninth Circuit case of *O'Neill* saying that, you

9   know, even if there's a problem -- you know, there the TMP had

10  filed bankruptcy and then the TMP had filed a petition, and the

11  petition nevertheless tolled the statute.  So the Government is

12  relying on this to say, "Similarly here, even if there's a

13  problem with the TMP status, the statute's still tolled."

14       Well, *O'Neill* doesn't apply here because in *O'Neill* the

15  Court was very clear that the IRS didn't know that the TMP had

16  filed for bankruptcy.

17       And there's significant authority in the area of tolling

18  of Tax Court petitions in tax cases where if the Government has

19  actual knowledge that there's a defect in the petition or in

20  the validity of the notice, then the statute can't be tolled.

21       One of these cases is *Greve versus Commissioner*.  It's --

22       **THE COURT:**  Are these cases all set forth in the

23  briefing that you provided to me?

24       **MR. SHAPIRO:**  Well, we just -- *O'Neill* was first

25  mentioned in the Government's last reply brief, and we haven't

1    had a chance to respond to that.  *Greve versus Commissioner*,

2    42 B.T.A. 142; and Midland Mortgage Company, 576 F.Supp. 101.

3        The Government can't rely on tolling when its own errors

4    led to the invalid notice and when the statute had already

5    expired.  The statute had already expired as a legal matter

6    because there were legal defects in the TMP status.

7        And, as a factual matter, we made a number of arguments on

8    burden of proof, how the burden of proof should be shifted to

9    the Government.  And here there's simply, in terms of looking

10   at the record on summary judgment as to whether this entity had

11   authority and whether the individuals that signed on behalf of

12   the entity had authority, there's simply not a complete record;

13   and we identified three reasons the burden of proof should

14   shift, and the Government hasn't responded to any of them.

15       One is Section 7491 requires the burden --

16           **THE COURT:**  There really is a limited amount of time.

17           **MR. SHAPIRO:**  Okay.

18           **THE COURT:**  There's a lot of stuff we have to do, and

19   I really want to bring to a close the intervenors' motions so I

20   can get to some discussion on the other issues.

21       So sum up in another minute.  I want to hear from the

22   Government, and then I want to move to the next motion.  I'm

23   sorry, but we just -- time is --

24           **MR. SHAPIRO:**  No, I understand.

25           **THE COURT:**  -- crunched.

1        **MR. SHAPIRO:**   Okay.   And the final point I would make

2    is that even if you accept -- we have arguments as to the

3    validity of Mr. Gonzales' consents; but even if you accept the

4    validity of those consents, the fact that -- the important

5    point, and we actually wrote an article about this in *Tax Notes*

6    that came out on Monday that was cited to in our brief

7    yesterday, even if the individual consent was valid through

8    2005, when Mr. Gonzales dismissed his Tax Court petition in

9    2008, the consent, the stipulation he signed did not extend the

10   statute for partnership items.

11       And the law is very clear that you have to expressly state

12   the extension for partnership items.   That's why in the

13   original consents that were signed it states that explicitly

14   the partnership items were extended.

15       The IRS failed to include that language in the 2008

16   extension and, therefore, the statute expired.   Even if it --

17   the statute was survived through 2005, it didn't survive past

18   2008.

19       It's 2013 now, and we identified a number of legal and

20   factual issues in our brief as to why the consents on behalf of

21   Presidio were not valid, why the consents on behalf of

22   Mr. Gonzales were not valid.   We believe the burden of proof

23   should shift.   We believe there's a lot of issues we identified

24   that the Government never even responded to:   The fact that

25   there were multiple consents signed, the second consents

1  invalidated the first consent, Odd Eckholt never had proper

2  authority.  There's no evidence in the record.

3           **THE COURT:**  Okay.  Thank you.

4        **MR. SHAPIRO:**  Thank you.

5        **THE COURT:**  The Government.

6        **MR. WEAVER:**  Thank you, Your Honor.

7      Let me try to address these maybe in reverse order here.

8  First, with respect to the stipulation, the Tax Court

9  stipulation that Mr. Shapiro is talking about, his reading of

10  that is just wrong.  And if you -- it's Exhibit 10, Docket

11  64-3.  It's very clear that the purpose of that stipulation is

12  to take care of items that are not in the partnership

13  proceeding.

14      And I think a fair reading of that is that whatever is in

15  the partnership proceeding is going to be preserved for the

16  partnership proceeding, and it's not a consent or an extension

17  whatsoever.

18      Furthermore, it's our position that once we received a

19  consent from Mr. Gonzales that took us past the issuance of the

20  FPAA and there was a timely petition filed by Presidio Growth,

21  that's all we need.  So that's all I have to say about the

22  stipulation.

23      More broadly, our logic is as follows:

24      If the FPAA notices were valid, and we believe they are,

25  and I want to speak to that briefly, and we have individual

1  consents for both Mr. Reddam and for Mr. Gonzales, that's it.

2        **THE COURT:**  How about the conflict issues?  I mean,

3  their principal argument is, okay, you've got individual

4  consents and that perhaps in one sense takes you out from under

5  the *Transpac*, some of *Transpac*; but they're saying that it

6  doesn't mean much because of the various conflicts that they

7  identified by virtue of the criminal investigation.

8        **MR. WEAVER:**  Well, Reddam's position is slightly

9  different than Gonzales'.

10        **THE COURT:**  Right.

11        **MR. WEAVER:**  Gonzales' is simpler so let me take that

12  first.  Gonzales, I think it's fair to characterize this, if

13  their individual consents are good, they're done.

14      They do not allege that Mr. Gonzales was somehow

15  conflicted himself out when he signed.  They're arguing that

16  the consents we received from the Tax Matters Partners are

17  invalid; but the law under the Tax Code is if you get a consent

18  from the individual partner, you're done as to that partner.

19      We got consents from Mr. Gonzales.

20        **THE COURT:**  Even if that partner has been receiving

21  advice and counsel from advisers who are, according to their

22  argument, motivated to curry favor with the Government?

23        **MR. WEAVER:**  Well, Gonzales did not brief that.  He

24  may have adopted the Reddam brief, but there's nothing in the

25  record to show that Gonzales was unduly influenced somehow.

1    You know, who was influencing him?  Because as far as we know,

2    he wasn't talking to Mr. Larson or Mr. Pfaff.

3         **THE COURT:**  Okay.  Let's talk about Reddam now.

4         **MR. WEAVER:**  Okay.  With respect to Reddam, I will

5    just refer you, with respect to the conflict of interest, to

6    two documents.  One Ms. Munk filed.  It's Docket Number 130-2

7    in the '63 case.  It's her Exhibit 53, and it's a conflict of

8    interest waiver with respect to the person she alleges had a

9    conflict that was advising Mr. Reddam to sign his individual

10   consents.  That person is Mr. Hasting of KPMG.

11        **THE COURT:**  Right.

12        **MR. WEAVER:**  All I want to say about that is, there it

13   is.  The conflict is identified and, lo and behold, he signs

14   anyways.  What more can you ask?  I mean, we've briefed this.

15        The other thing to say about the conflict of interest

16   argument in general, staying with that for a second, is it's

17   not enough to allege or suspect or speculate about conflict.

18   That's the Ninth Circuit case of *Phillips*.  You have to show an

19   actual conflict.

20        They're the moving party.  They have the burden of proof.

21   They haven't met that burden of proof.  And, moreover, here

22   there's a fundamental difference between their position, their

23   litigating position here, and *Transpac*; and that is, they

24   wanted to sign consents.  They signed consents.

25        In *Transpac* the real problem the Second Circuit had was

1   that the IRS went to the individual partners and they refused;

2   and then, only and then, did they go to the Tax Matters Partner

3   who was cooperating.

4        So that's just not the case here, and that's all I have to

5   say about that.

6             **THE COURT:**  Okay.  Yes?

7             **MR. WEAVER:**  I have -- quickly if I can, Your Honor,

8   the other thing I would just add is the other hook that we have

9   to cross to get where we need to be is the validity of the

10  FPAA, and Mr. Shapiro raises that in the Gonzales brief,

11  Mr. Wood does.

12       And I would refer you to three Ninth Circuit cases.

13  *Stone* -- well, let me rephrase that, that were affirmed by the

14  Ninth Circuit:  *Stone Canyon Partners v. Commissioner*, *Seneca*

15  and *Anderson*.  All of those cases, plus a couple others, the

16  *Chomp* case in particular, are directly contrary to

17  Mr. Gonzales' position here.

18       And the idea is, we sent out not only FPAAs, the notices,

19  to everybody in the world, which should be enough, we sent it

20  out generically to a Tax Matters Partner care of the address;

21  and the case law says, if you do that, that's fine.  As a

22  matter of fact, the *Chomp* case says this is a valid mechanism

23  for doing this.  It's in the regulation, and it's especially

24  apt in confused circumstances.

25       And if you read the papers, I was thrilled that

1    Mr. Shapiro wanted to submit this stuff in camera yesterday

2    because it lays out perhaps better than I can the legal

3    analysis that the IRS had to go through.

4        I mean, the IRS was between a rock and a hard place.  On

5    the one hand, maybe Presidio Growth was still a Tax Matters

6    Partner.  He's wrong about his legal analysis on whether

7    there's a difference between state law and tax dissolution.  In

8    fact, there's a revenue ruling, I think it's notice -- we cite

9    to it in our papers.  I think it's 2480 or something like that,

10   2488, where the IRS has specifically indicated a single-member

11   LLC can be a Tax Matters Partner.

12       So on the one hand we have information.  The IRS was

13   clearing mulling this over.  On the other hand, if they just

14   went out, as Mr. Shapiro suggested we do, and appoint another

15   Tax Matters Partner, you know what?  They'd be right back in

16   here saying, "Oh, you did it wrong.  You should have stayed

17   with Presidio Growth."

18       We did our best.  We sent notices out to everyone and we

19   complied with the statute.

20       **THE COURT:**  All right.  I want to move on to the

21   substantive motion.

22       So who wants to speak on the motion for summary judgment?

23       **MR. BAUER:**  Your Honor, if your hard stop is 45

24   seconds ago, I would be very willing to come back tomorrow

25   morning for 15 minutes to be able to say my piece.

1          **THE COURT:**  I've got lots to do tomorrow morning.

2   This is your moment.  Go for it.

3          **MR. BAUER:**  Okay.  My shining moment.

4      Well, I will agree with you that these are convoluted

5   investments, but they're actually quite interesting when you

6   get in them; and I think my summary statement is for you to

7   make a judgment of whether these will work or whether they

8   don't under the theories that the Government's presented.

9   You're absolutely making decisions of fact because there are

10  fact issues here.  You can't possibly --

11         **THE COURT:**  Summarize the fact issues for me.

12         **MR. BAUER:**  There are challenges on the economic

13  substance doctrine.

14         **THE COURT:**  Right.

15         **MR. BAUER:**  Two prongs in the Ninth Circuit, one

16  objective, one subjective.

17         **THE COURT:**  Right.

18         **MR. BAUER:**  The objective one, the case they cite says

19  no practical economic effects; right?  And, so, that's a fact

20  question.

21      Could someone make money if the Argentine peso devalued?

22  Yes, in fact, it did devalue a year later.

23         **THE COURT:**  I don't think the standard is could

24  conceivably some money be made during the 60-day window; and I

25  think it's pretty compelling that out of, I forget how many

1   investors are involved, two of them stay on more than 60 days.

2       And with Mr. Rifkin's testimony and the other testimony in

3   the record, I don't think there is a dispute that the investors

4   go in and out in 60 days.  And the idea that the peg is going

5   to be broken in 60 days, there's evidence that says it is

6   almost infinitesimal that that would occur.

7       And the standard is not conceivably could money be made.

8   It's -- I forget the language, but there's case law that says

9   it has to -- there has to be substantive economic benefit that

10  is being sought from this, and the undisputed facts here show

11  this was designed to generate tax losses.

12      Go ahead.  Sorry to take part of your time, but go ahead,

13  Mr. Bauer.

14      **MR. BAUER:**  High-risk, high-return investment.  That's

15  what the Larson declaration says.  That's what the Pfaff

16  declaration says.  That's what Makov's long deposition said,

17  which is the only testimony from him that's admissible in this

18  case.

19      So absolutely high risk, but potentially very high

20  returns.  It could happen in 60 days.  It could happen in a

21  year.  It could happen in two days.

22      One of the key evidence, pieces of evidence, that shows

23  that that's a fact is it is undisputed here, conceded by them,

24  that the banks hedged this investment.  They didn't want to

25  have a risk that the peg could break and they could lose all

1   their money, so the banks spent money hedging the investment.

2       Are there practical economic effects?  Certainly.  This is

3   not a made-up investment.  It is an investment that is

4   admittedly high risk, high return, but you would have to be

5   making some factual finding that somehow that this is not a

6   high-risk, high-return investment.

7       **THE COURT:**  No.  I'd be taking into account the

8   standard.  The standard is, where perhaps you and I part

9   company, is what I'm hearing you saying is, if there's any

10  conceivable way money could be made out of this investment,

11  then, therefore, summary judgment should be denied.

12      And I think the standard is -- the undisputed fact

13  analysis goes to whether or not when the facts of this

14  investment reflect whether or not it has substantial economic

15  aspect to it, and I don't think there are any undisputed facts

16  that indicate it was anything but a loss-generating enterprise.

17      **MR. BAUER:**  And what you've done there, right, is

18  you've moved into the subjective prong of it; and the

19  subjective prong is:  Did investors, did the people in charge

20  of the partnerships believe they could make money on it?  And

21  you have in the record, you know, as a factual statement; and

22  these guys will come in here and testify:  Larson, Pfaff, and

23  the Makov deposition and Mr. Reddam's declaration.

24      If you're making that decision, you're saying, "I don't

25  believe their testimony," and you haven't seen it; and you

1 would being doing it on the basis of declarations from people

2 that you haven't seen that are also contradicted by all the

3 evidence of what they used to say before the Government got

4 cooperation agreements out of them.

5   Part one is objective and the test is not was their

6 substantial.  You can have -- think of all these venture

7 capital investors.  They're going on 2 percent chances, but

8 there's a huge venture capital industry.  Think of all the

9 low-risk -- I mean, high-risk, high-return investments that

10 people with a lot of money would make.  This isn't an

11 investment that you or I would make.  This is something --

12 these are ones that people looked at that and said, "My

13 goodness, I can get in and have a 40-million-dollar short on

14 the Argentine peso, and" --

15   **THE COURT:**  Within 60 days?

16   **MR. BAUER:**  Within 60 days.

17   **THE COURT:**  Where's the evidence that there is any

18 realistic prospect within that 60-day window?  And I think it's

19 undisputed effectively that it's an in and out in 60 days.

20   **MR. BAUER:**  Well, the --

21   **THE COURT:**  And, so, if it's in and out within 60

22 days, where is there any evidence that this is realistically

23 the breaking out of the currency pays?  Even your own people

24 are saying there's no real prospect for that.

25   **MR. BAUER:**  I disagree, Your Honor.  And the test

1  isn't realistic by whose standard.  What are the chances?  All

2  right.  What are the chances?  Nobody knows.  You can't predict

3  when the lightbulb's going to burn out exactly.  You know it's

4  going to burn out, but you can't predict when.

5      We know these are valid investments because people make

6  them all the time.  Everyone is shorting and going long

7  currencies all the time; and if the Court's logic were

8  accurate --

9          **THE COURT:**  Yeah, but they don't have all these other

10  built-in component parts to this transaction which, as you look

11  at them, are designed for purposes of inflating the basis for

12  purposes of generating losses.

13          **MR. BAUER:**  No one is denying that this was a

14  tax-based investment.  No one is denying that.  All these

15  people went in there having made gains and wanting to have this

16  possibility of getting this tax benefit.  So no one's denying

17  that at all.  I mean, KPMG and Brown & Wood wrote the opinions.

18      Of course it's tax based, but the test isn't a realistic

19  possibility based on, you know, your economics or my economics.

20  It's what an investor actually thought, and did the investor

21  believe that this was a good investment for them, did he think

22  he could make money.  Were there practical economic effects?

23  Certainly, people made and lost money on those pegs -- on those

24  investments when they happened.

25      I understand what you're saying, and I understand that in

1    a bench trial I'm going to be swimming upstream; but without

2    actually seeing the evidence and hearing the people testify,

3    with all due respect, I think you're making fact and

4    credibility judgments about the Larson declaration, the Pfaff

5    declaration, the Makov deposition testimony, which even in

6    advance of a bench trial is not appropriate at the summary

7    judgment level.

8         I think that when you see the testimony and hear what

9    these people have to say, I might be able to change your mind.

10        **THE COURT:**  Okay.  Thank you.

11        The Government?

12        **MR. WEAVER:**  Yes, Your Honor.

13        Let me briefly address why this case is, in fact,

14   appropriate to dispose of on summary judgment, and I want to

15   start out with the legal standard which Mr. Bauer did not get

16   correct.

17        He did cite the sham test is whether a transaction had any

18   practical economic effects on the creation of income tax

19   losses, and there is a subjective and an objective side.  But

20   the fact of the matter is, and the standard is not contradicted

21   in the *Casebeer* case, which is the leading Ninth Circuit case,

22   the lack of economic substance alone suffices to invalidate a

23   transaction even if there's some subjective belief,

24   unreasonable belief, on the part of a taxpayer that there might

25   be some profit potential there.

1    What's the authority for that?  Well, the authority is the

2    Fifth Circuit case of *Klamath* which cites to the Federal

3    Circuit, which is the *Coltec* case, the *Coltec* at the Federal

4    Circuit level; the Third Circuit; the Tenth Circuit.

5    And then there's this, and I think this seals the deal,

6    and that is Footnote 8 out of *Casebeer* is addressing an

7    argument similar to the one Mr. Bauer just made about

8    subjective intent.  Quote:  (reading)

9         "The presence of a business purpose does not entitle

10        a transaction to be recognized for federal tax purposes

11        where objective indicia of economic substance indicating a

12        realistic potential for economic profit are not manifest."

13    Then it says:  (reading)

14        "Although this statement conflicts with prior Tax

15        Court authority," citing to what became a Fourth Circuit

16        case, *Rice World*, here's the kicker, quote, "it is not

17        inconsistent with our flexible application of the

18        two-prong test."

19    Now, Your Honor, we cited to the Scott --

20        **THE COURT:**  Was that on summary judgment?

21        **MR. WEAVER:**  I believe that was a trial, Your Honor,

22    but --

23        **THE COURT:**  All right.  That's of some consequence;

24    isn't it?

25        **MR. WEAVER:**  Well, no.  The idea, Your Honor, is that

1   if this transaction is so far afield, you do not have to

2   take -- if there is -- if you can decide beyond any reasonable

3   dispute that this transaction lacked substance, you can stop

4   right there.

5        And given that circumstance, what's in evidence?  Well,

6   there is a very general declaration from Mr. Larson and

7   Mr. Pfaff; and, you know, they talk about "I believed," "I

8   understood," but there's no objective analysis.

9        One of the reasons that this case is ripe for summary

10  judgment, there's only one objective expert that's going to

11  even appear at trial.  Now, that's Dr. DeRosa.

12            **THE COURT:**  Your expert.

13            **MR. WEAVER:**  Our expert, the only one.

14       But there's another reason, and that is, what's the

15  transaction that matters?  And there's plenty of case authority

16  for this, both the *Coltec* case; there's a Third Circuit case,

17  *ACM*; *Sala*, a Tenth Circuit case.  We cited to these.  And that

18  is, the transaction that matters is the one that creates the

19  tax benefit.

20       So the undisputed testimony is that, you know, the tax

21  benefit was created by a premium loan; and the record is devoid

22  of any contrary evidence that that premium loan, the high

23  front-loaded interest that was supposed to be of such great

24  convexity benefit or front loading it, that got wiped out.

25  That got wiped out, Your Honor, by the simultaneous execution

1    of a swap arrangement.

2         Now, that's addressed in DeRosa's opinion.  If I had more

3    time, I had some charts I wanted to take you through, but let

4    me refer you to two additional exhibits in addition to the ones

5    that I talked about in our papers that I think are just

6    incredibly compelling.

7         One is our Exhibit 812.  It's a spreadsheet which Presidio

8    produced to the Government, so it's an internal Presidio

9    document, that shows how the transaction in the Shasta case was

10   unwound.

11        And keep in mind, Larson and Pfaff have declared that all

12   these transactions are basically the same thing.

13        Exhibit 812, Your Honor, if you take the loan premium

14   amount that was originally advanced in Shasta, $35.5 million,

15   and then you look over how they unwind the transaction, there's

16   a prepayment penalty under the premium loan.  You add up the

17   prepayment penalty and the swap termination fee, boom, you have

18   $35 million.

19        They repay the principal dollar for dollar.  What interest

20   do they end up paying?  The swap interest rate.  That's a

21   low-interest rate.  It's a market interest rate.  There's no

22   convexity associated with a market interest rate because the

23   price doesn't change on a bond that has a floating interest

24   rate when interest rates change.

25        And, so, Your Honor, looking at the other exhibit,

1    Exhibit 835, that's their Form 1065 tax return, what did they

2    report?  These wonderful high-interest rate benefits of this

3    premium loan, is that what they reported on their tax return?

4    Absolutely not.

5         Because if you look at the unwind sheet, the premium

6    interest is over $2 million.  They report as investment

7    interest expense something on the order of 1.2 million.  And

8    what is that?  It's precisely two things; and we know this

9    because, thanks to Mr. Bauer, I didn't submit this, he

10   submitted a work sheet, I think it's Exhibit T, and you can

11   trace through to the amount on the partnership K-1s by adding

12   two things:  The additional margin amount, which is listed

13   there, to the swap interest.

14        Those two things will add up in the Shasta case to

15   1.2 million.  They'll add up to whatever they did in Belford;

16   but the idea, Your Honor, is that exactly precisely what is

17   this in economic reality?  It's a floating-rate note for the

18   full amount of the funding amount, and that doesn't provide any

19   economic benefit that the plaintiffs claim it does.

20        Finally, let me just also --

21             **THE COURT:**  Well, but doesn't -- I mean, Mr. Bauer's

22   point seems to be that even granting all of those benefits in

23   terms of tax benefits that these investors are going to get,

24   they have the upside potential of some benefit, albeit a very

25   risky and perhaps unlikely event, that there's going to be this

1  breakout of the currency peg and the Argentine peso is going to

2  go crazy and they're going to benefit.

3  　　　　MR. WEAVER:  That had nothing to do with the loan

4  transaction.  The loan proceeds were invested in Eurodollar

5  rolls that DeRosa explains are nothing more than U.S. time

6  deposits.  In fact, it's just incorrectly stated in

7  petitioner's brief.

8  　　　　THE COURT:  There was some currency trading that

9  actually did occur, the minimal.

10 　　　　MR. WEAVER:  The minimal currency trading -- these

11 forward contracts in the Argentine peso and Hong Kong dollar

12 had zero value at the outset.  They only have value if

13 something goes awry and the peg breaks.

14 　　　And the testimony of the only objective person in the

15 case, DeRosa, who advanced an objective opinion and analysis,

16 is that those were supported by the small amount that the

17 taxpayer put in.

18 　　　All of the loan funds, they were rolled over for amount of

19 interest that was less than they were paying on the loan.  It

20 was a guaranteed money loser with the loan funds, and that was

21 intentional because then you can squeeze out an investor that

22 stayed in too long and didn't just take the tax benefits.

23 　　　And with respect to the currency forwards having been

24 funded by those small taxpayer margin, having nothing to do

25 with the transaction that matters here, which is the loan

1   transaction, we also submitted some declarations.  We have a

2   declaration from the HVB banker Domenick DeGiorgio who says

3   that the loan had nothing to do with the Hong Kong dollar

4   trades that had this remote possibility of earning a profit.

5          Likewise, we submitted the equivalent of essentially a

6   30(b)(6) declaration from Deutsche Bank and I believe also from

7   HVB Bank.  They basically say the same thing.

8          So, Your Honor, the short of it is, it's the loan

9   transaction that mattered.  That's the way that the *Klamath*

10  case was analyzed.  We don't agree with everything in the

11  *Klamath* case but Judge Ward in the *Klamath* case looked to the

12  loan transaction.

13         Now, I haven't really had an opportunity to address, and I

14  know I'm running up against your deadline, Your Honor, but, in

15  addition, if you actually look at the loan agreements and

16  start, you know, going through the terms, the loan collateral

17  was locked up.  You had to actually have 101 and a quarter

18  percent on collateral with the bank.

19             **THE COURT:**  Calm down, Mr. Bauer.  You don't -- you

20  know, it's not appropriate to go through histrionics when --

21             **MR. BAUER:**  I'm sorry, Your Honor.  It's outrageous.

22             **THE COURT:**  -- your counterpart is making arguments.

23  I know you think it's outrageous, but calm down.

24             **MR. BAUER:**  Okay.

25             **THE COURT:**  Go ahead.

1      **MR. WEAVER:**  And if you look at the terms of the loan,

2    it's not just 101 and a quarter percent, because there is a way

3    that they have to value the collateral.  It takes it up,

4    according to DeRosa, to something like 101.6 percent.

5      So there is just no way, if anything started going bad,

6    these trades would have been closed down by the bank and that

7    would have been it.

8      These were tax-motivated deals.  There was no reasonable

9    chance of making a profit.

10      And with respect to the penalties, because I don't want to

11    forget about the penalties, I need to tell you two things.

12    First, petitioner's have briefed the penalties.  We've briefed

13    the penalties.  We didn't really do them justice.  The issue

14    about subject matter jurisdiction on penalties and the

15    40 percent are on appeal to the Supreme Court.  It's the

16    *Woods/Tesoro* case.  So that remains on appeal.

17      But what do we have here?  We have a situation,

18    Your Honor, where Mr. Makov, Mr. Larson, and Mr. Pfaff

19    certainly had to know at a minimum that this was a negligent

20    tax shelter as structured because they, in fact, admitted it.

21      In fact, one of the things we put into evidence was the

22    Rifkin declaration; and you can tell from the Rifkin

23    declaration that there was a Dallas meeting, and in that

24    meeting Makov actually says that there was only a very remote

25    chance for profit.

1          **THE COURT:**  I'm anticipating what your counterparts

2     will argue.  Aren't you now selecting out certain aspects of

3     declarations and ignoring others?  In other words, isn't that,

4     as according to their argument, the factual dispute that we're

5     going to get to because people like Pfaff and Larson are

6     providing at various other points along the path declarations

7     or statements that reflect a different view?

8          **MR. WEAVER:**  There is nothing in the record that

9     specifically counteracts the reality that the swap canceled out

10    the loan agreement, and there is -- that's as far as you really

11    need to go.

12         But let me close by referring you to the *Scott v. Harris*

13    case; and although I can't be as exciting as that case, that's

14    the case where there are two wildly different versions of what

15    happened in a high-speed car chase between the police and a

16    driver, and I think the driver ended up being a quadriplegic

17    and sued.

18         And, you know, I think it went up through the Eleventh

19    Circuit, and the nonmoving party was the driver who had been

20    rammed by a police car.  And, so, the Eleventh Circuit says,

21    "We can't resolve this on summary judgment.  There are two very

22    differing versions."  And the Supreme Court said, "Yeah, but

23    for one thing, there's a videotape."

24         **THE COURT:**  I know, that's a very controversial

25    decision and that one -- yes, the Supreme Court did look at

1    that videotape.  Now, whether or not that's consistent with

2    other Supreme Court decisions as to whether or not the

3    Appellate Court should be looking at that kind of evidence is a

4    different proposition.  But, okay, I hear you.  I understand.

5            **MR. WEAVER:**  And, so, if you look at that unwind sheet

6    as I told you, when you look at the documents, you don't even

7    need the testimony.  It was guaranteed that this was a

8    floating-rate note that didn't provide any real tax benefits.

9    Economically that's all this transaction was at best.

10           **THE COURT:**  All right.  Mr. Bauer?

11           **MR. BAUER:**  Okay.  I apologize again, Your Honor.  I'm

12   sorry.  I think it's the time pressure of having on a summary

13   judgment --

14           **THE COURT:**  You're a fine advocate who's an advocate,

15   and I understand that.

16           **MR. BAUER:**  Okay.  But I do apologize sincerely.

17       But he stood up and made about 10 really fast factual

18   arguments to you, and just illustrating why this is a trial and

19   not a summary judgment case.

20       For example, he's talking about Mr. DeRosa and whether the

21   loan is ever used in these investments.  Well, in their own

22   brief on page 35, the Government says, "Yes, the loan is used

23   as collateral."

24       When I take Mr. -- what's his name? -- DeRosa's deposition

25   and say, "So you say that the loans weren't used as collateral,

1  how could that be?"

2      My clients swear that they are, swear they believe they

3  are.  Makov testifies in a deposition with great detail, you

4  know, with supporting documents how it was used.

5      And what does DeRosa say?  He said, "Well, somebody once

6  called me and told me I didn't have to do that."

7      I said, "You're kidding me?  You're the big expert for the

8  United States Government, a key point in the case and who

9  called you?  What did they say?"

10      "Oh, it's, like, a guy called me."

11      And you're saying that's an undisputed fact?  I mean, it's

12  laughable on its face.

13      The idea that the swap negates the loan, that's just

14  factually wrong.  It's not like a mortgage where you refinance

15  a mortgage and then the loan is gone.  A swap is a hedge.  So

16  if I'm long, if I'm long on a stock and then I short the stock

17  too, it doesn't mean I don't own the stock.  It means I'm long

18  and I'm short.  I have two different contracts, and there are

19  tax consequences to both.

20      So to say that -- I mean, that's just factually wrong, and

21  there's no person who can declare that to be truthful; and our

22  testimony will be, no, that's not truthful.

23      You know, just one after the next, after the next, these

24  are all fact issues.

25      Your Honor, I don't know, apparently our briefs maybe

1   didn't make it clear enough when you say that the actual

2   currency forwards were negligible.  They weren't.  This was

3   big-time money.  This was probably -- the hypothetical that

4   they always used would be a hundred-million-dollar loan.  It

5   would have a 60-million-dollar premium and $60 million would be

6   the notional value of these currency forwards.

7        So if, like as we've shown, all these different currencies

8   that broke during the 1990s, if the Argentine peso had broken

9   during that time and, you know, it devalued, it devalued

10  70 percent, a person that has a 60-million-dollar investment

11  there would make $42 million.

12       I mean, this was big time.  You know, KPMG, Brown & Wood,

13  fancy investors.  There's a lot of money involved in it.  None

14  of these investments were negligible.

15       One of these key points of the investment, as folks will

16  testify, was that the investment was nonrecourse.  So investors

17  could go in there, get access to these very big currency plays

18  without putting their other, you know, fortunes at risk; and

19  then they had a possibility that, because of the use of the

20  loan, they would get a tax benefit.  They knew it wasn't for

21  sure, but they knew -- they thought that someday they'd get a

22  day in court to say whether -- you know, to analyze the tax

23  aspects of this.

24            **THE COURT:**  It's not a possibility of tax benefit.

25  That, they were somewhat assured of; wasn't it?  It was

1   possibility of upside profit.

2        **MR. BAUER:**  No, no, no.  The opinion letters and the

3   way all this IRS stuff works is the opinion said, "It's more

4   likely than not you're going to get your tax benefit."  Nobody

5   promised everybody they would get the tax benefit.

6        When I first got into this, Your Honor, there's all these

7   different levels of legal opinion that you can get under the

8   IRS Code, and this one is more likely than not; meaning you'll

9   get your day in court and someday Judge Seeborg will say

10  whether you get that or not.

11       My last point, and this was in the brief, you know, there

12  is no loan that is morally superior to any other loan.  And

13  while he says, "Oh, a premium loan, how could this -- this is

14  some weird loan," it's not.  There's sections in the IRS Code

15  going back to, I think, the '30s talking about tax treatments

16  of premium bonds, which is what a premium loan is.

17       So a mortgage is like the ultimate premium loan because at

18  the end of your payment period, you don't owe anything.  You

19  know, a bond you borrow money, you pay interest, and then you

20  have to pay the principal back at the end, but there's no

21  reason it has to be that way.  There's negative amortization

22  loans in which you owe more at the end.  There's ones where you

23  pay -- Makov talked about in his deposition and showed that

24  there are many instances where people borrow a premium.  For

25  some reason a lot of municipalities borrow using premium loans

1   because they're trying to adjust their cash flow in some way.

2       So just to say, "Ah, this is some crazy loan so that, you

3   know, you should throw out the transaction because of that," I

4   mean, that's just factually wrong.

5           **THE COURT:**  I don't hear the Government arguing that

6   because there is a premium loan here that it's, by definition,

7   some sort of sham.  I hear them saying that you look at this

8   entire -- you have to step back and look at the whole

9   transaction and you have to look at the premium loan component

10  in terms of how it works in this investment, not that there's

11  something nefarious in and of itself in a premium loan

12  structure.

13      So I didn't hear them say, "Oh, you know, just look.  You

14  see that there's a premium loan component to this and,

15  therefore, it's a tax shelter that is designed purely to obtain

16  tax losses."

17      They're saying, "Look at this whole transaction.  Look at

18  the 60, 120, 7-year life, various other components of this.

19  Step back and look at it all and see what it's designed to do."

20          **MR. BAUER:**  I hear what you're saying.  That's the

21  broadest economic substance point, which is, can you make money

22  on this overall scheme if the peg breaks, can you make money.

23  We sort of talked about that.

24      The loan argument that they make is a little bit

25  different.  The loan argument, as I understand it, is that, you

1  know, we say and they now say that the loan is necessary

2  because it serves as collateral for the investments.  Okay.  So

3  it's used in the investment program in that way, and that's

4  what the KPMG opinion said also.

5       What I hear them to say is that the premium loan doesn't

6  make a difference.  They say the premium doesn't help you, and

7  I understand that argument to be, "Look, you could have used

8  some other kind of loan and you wouldn't have gotten these

9  possible tax benefits."

10      And my argument is:  No loan is morally superior to any

11  other kind of loan.  Of course, they chose the premium loan

12  because of the premium bond and liability sections under the

13  IRS -- in the IRS Code.  So they were trying to get a tax

14  benefit by doing a particular kind of loan, and there's nothing

15  that prevents anybody from doing that.

16      So that -- I think I -- if you understand that argument,

17  Your Honor, it shows that a loan is necessary.  It doesn't

18  matter what kind of loan, and any taxpayer can choose the kind

19  of loan that is most advantageous.  If I want to borrow money,

20  I can do it through a mortgage.  I can do it through a line of

21  credit.  Some might be deductible, it might not.  I can choose

22  the way I'd like to borrow the money in order to get a tax

23  benefit.  It doesn't make it suspect.

24          **THE COURT:**  Okay.

25          **MR. BAUER:**  Okay.

1          **MR. WEAVER:**  Your Honor, can I just, two minutes?

2          **THE COURT:**  I have to go.  I'm expected on a

3    conference call and you've extensively briefed this, and I have

4    plenty of material with which to go back and examine it and

5    think through it and make a decision.  So thank you, but we're

6    done.

7                    (Proceedings adjourned at 4:28 p.m.)

8                            ---oOo---

9

10

11                    <u>CERTIFICATE OF REPORTER</u>

12          I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:   Monday, July 8, 2013

16

17

18

19    _____

20          Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                      U.S. Court Reporter

21

22

23

24

25