United States District Court
For the Northern District of California

1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                         SAN FRANCISCO DIVISION

10

11

12  SHASTA STRATEGIC INVESTMENT          **No. C-04-04264-RS**
    FUND, LLC; AND PRESIDIO GROWTH       (Related to Case Nos. C-04-4309-RS, C-
    LLC,                                 04-4398-RS, C-04-4964-RS, C-05-1123-
13                                       RS, C-05-1996-RS, C-05-2835-RS, and C-
                                         05-3887-RS)
14              Petitioners,
         v.
15                                       **ORDER GRANTING RESPONDENT'S**
    UNITED STATES OF AMERICA,            **MOTIONS FOR SUMMARY**
16                                       **JUDGMENT AND DENYING**
                Respondent.              **INTERVENORS' MOTIONS FOR**
17                                       **SUMMARY JUDGMENT**
    _____/
18

19                         I.   INTRODUCTION

20          Petitioners brought this action to challenge an IRS determination concerning the tax

21  treatment of certain partnership items reflected in petitioners' 1999 and 2000 tax returns.  The

22  government previously moved for summary judgment, as did two intervening partners.  Those

23  motions were withdrawn after argument in order for the government to conduct further discovery.

24  The government has now renewed its motion for summary judgment, arguing the subject

25  transactions lacked economic substance and should therefore be disregarded for tax purposes.

26  Petitioners oppose the government's motion, arguing the transactions carried both an objective

27  economic substance and a subjective profit motive.  The government also moves for summary

28

United States District Court
For the Northern District of California

judgment against the intervenors, seeking a determination that the agency's actions were timely. The intervenors each separately oppose the government's motion and also bring separate motions to dismiss or for summary judgment on the same basis. For the reasons stated below, the government's motion for summary judgment against petitioners is granted. The intervenors' motions for summary judgment are denied, and the government's motion against the intervenors is granted.

## II.  BACKGROUND

Petitioners are each a limited liability company, treated for tax purposes as a partnership. John Larson, Robert Pfaff, and David Amir Makov were the managers and principals of the parent of Presidio Growth, LLC ("Presidio"), petitioners' managing partner and tax matters partner ("TMP"). David Rivkin was a senior manager for KPMG, an accounting firm that marketed the investment product at issue in this case, a "Bond Linked Issue Premium Structure" or "BLIPS." Rivkin Decl. ¶¶ 5, 12. Intervenors J. Paul Reddam and Tom Gonzales were each clients of Presidio whose wholly-owned limited liability corporations, Clarence Ventures, LLC, and Birch Ventures LLC, respectively, invested in strategic investment funds ("SIFs") managed by Presidio.

A.  <u>Presidio and Presidio Advisory</u>

In 1997, Larson and Pfaff left KPMG to form an investment advisory firm, Presidio Advisory, with Makov as its investment advisor. Pfaff Decl. ¶ 8. Presidio was formed as a subsidiary to Presidio Advisory. *See* Munk Decl. Ex. 17. Its members were Hayes Street Management, Inc. ("Hayes Street") and Norwood Holdings, Inc. ("Norwood"). Munk Decl. Ex. 3. Larson and Pfaf were tax accountants with law degrees; neither was certified as a financial analyst, credentialed as a broker, nor licensed to sell investment products. Confid. Mem. at 6, Ex. C to Pet.; Larson Dep. 10:20–11:7. Pfaf then reached out to KPMG, proposing a "close relationship" with the accounting firm to provide a variety of "turn-key," "tax-advantaged" products. Weaver Decl., Ex. JL-29 at 1–2, 4. After learning in 1998 that KPMG "was interested in offering a new tax-driven product" to its clients, Larson and Pfaf presented a strategy to KPMG involving the use of a premium loan. Larson Dep. 27:2–11, 291–32:15.

**United States District Court**
For the Northern District of California

1  In the spring of 1999, Rivkin learned he had been assigned to a "task force" for KPMG's

2  newest tax product for individual taxpayers: BLIPS.  Rivkin Decl. ¶ 7.  In that context, he attended a

3  training session in Dallas also attended by Makov and Larson on behalf of Presidio.  *Id.* ¶¶ 7, 10.  A

4  handout provided at the meeting described the BLIPS investment strategy as "designed to generate

5  significant investment returns through strategic investments in emerging market currencies."  Rivkin

6  Decl., Ex. B-93, p. 2.  The actual presentation, however, described BLIPS as a tax loss generator.

7  Rivkin Decl. ¶ 12.  Larson and Makov explained to the attendees that they planned to invest in

8  foreign currencies that were pegged to the U.S. dollar.  Rivkin Decl. ¶ 29.  Investors stood to profit

9  if the foreign currencies broke away from their pegs and plummeted in value, a prospect Makov

10  characterized during the presentation as very, very low or remote during such a short period of time,

11  an assessment which Rivkin in turn conveyed to potential BLIPS clients.  *Id.* at ¶¶ 26–27; Makov

12  Depo. 48–50, 58–74.

13  BLIPS ostensibly consisted of three stages: an initial 60-day stage, in which the client's

14  funds would be used to invest in low-risk investment strategies; a second 120-day stage, in which

15  slightly riskier investments would be pursued with more of the SIF's capital; and a third stage

16  lasting the remainder of the 7-year term, in which the SIF would pursue investment strategies that

17  had the potential for greater rewards with substantially greater risk.[1]  *See* Makov Depo. Ex. 19.

18  Rivkin declares he was told at the meeting in Dallas that investors were not expected to stay in the

19  program beyond the first sixty-day stage, but that the seven-year term was required to construct the

20  large premium that would result in a tax loss.  Rivkin Decl. ¶¶ 29, 42.

21  KPMG's Washington National Tax Practice and the law firm of Brown & Wood each

22  provided legal opinion letters concerning the predicted tax treatment of the investment program.

23  Pfaff Decl. ¶ 11.[2]  Many investors also retained their own tax advisors.  *Id.*  Presidio and its

24

---

25  [1] Makov explained that the tiered-risk strategy provided clients with an opportunity to develop increased trust in his investment strategies over time.  Makov Depo. at 205.

26  [2] In one such opinion letter, KPMG opined "there is a greater than 50 percent likelihood (i.e. it is "more likely than not")" that a variety of positions will be upheld if challenged by the Internal

27  Revenue Service.  *See* Larson Decl. Ex. W.  This opinion was based on representations made by the parties to the transaction, such as "Presidio believed there was a reasonable opportunity for Investor

28  No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    investors purportedly relied on these opinions in choosing to offer and participate in the BLIPS

2    investment strategy.  *Id.* at 11, 13.

3        B.  BLIPS Transactions

4            To participate in the BLIPS program, each client established a single-member limited

5    liability corporation (referred to here as an "LLC-1").  Rivkin Decl. Ex. B-93.  The LLC-1 would

6    take out a premium loan from one of the participating lenders:  Deutsche Bank, Hypo Vereinsbank

7    ("HVB"), and National Westminster Bank ("NatWest"), a subsidiary of The Royal Bank of

8    Scotland.[3]  *Id.*  In exchange for agreeing to an interest rate much higher than the market rate (a rate

9    to be determined later in the transaction) the lender would extend to the borrower both the principal

10   amount of the loan as well as a substantial additional "premium" amount.[4]  Significantly, the

11   premium was set to equal the client's desired tax loss; the principal was calculated so that the

12   premium equaled approximately 60% of the principal.  *See* DeRosa Decl. ¶ 10; DeRosa Rpt. ¶¶ 30,

13   34, 57–63; Rivkin Decl. ¶¶ 22, 24; Larson Dep. 38:3–8, 116:15–117:2.  The client would then make

14   an additional cash contribution to the LLC-1 equal to approximately 7% of the premium.  *See*

15   DeRosa Decl. ¶¶ 9–10, 27–28; DeRosa Rpt. ¶¶ 30, 93–99; DeGiorgio Dep. 243:6–244:14; DeRosa

16   Rpt. Appx. 3, ¶ 26; Rivkin Decl. ¶¶ 21–23.

17           Seven to twelve days later, the LLC-1 would contribute all of these funds to a strategic

18   investment fund ("SIF" or "LLC-2") managed by Presidio.  *See* DeRosa Decl. ¶ 10; DeRosa Rpt.

19   ¶ 30; *see also* Rivkin Decl. ¶¶ 21–23, 33 & Ex. B-93, p. 7; Confid. Mem. 12, Ex. C to Pet.  The

20   LLC-2 in turn assumed the obligation to repay the loan principal to the bank but, for purposes of

21   calculating the client's outside basis in the LLC-2 partnership, any obligation to repay the loan

22

23   to earn a pre-tax profit, in excess of all associated fees and costs, and without regard to any tax
     benefits that may occur, by participating in the Investment Fund."  *Id.* at 11.
     [3] Deutsche Bank was the first to participate in BLIPS; it served as the accommodating bank for 56
24   SIFs in 1999.  HVB served as the accommodating bank for 11 SIFs in 1999 and 18 in 2000.
     NatWest served as the accommodating bank for 1 SIF in 1999 and seven in 2000.  In total, 93 SIFs
25   were established through which 186 taxpayers engaged in BLIPS transactions.  Gee Decl. ¶¶ 4-6.
     [4] The loan was a seven-year, fixed-interest rate, interest-only until maturity loan, comprising the
26   stated principal and an initial unamortized premium.  *See* Larson Decl. Ex. I. §1.01.  It included a
     prepayment penalty that declined over time.  *See id.* at § 3.02.  It also included a "breakage fee" if
27   prepayment was made within the first six months after the borrowing date.  *See id.* at § 3.03.

28                                                                          No. 04-cv-04264-RS
                                                                            ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1   premium was treated as contingent and not a liability for tax basis purposes.[5]  In other words, each

2   client's outside basis in the LLC-2 was equal to the original loan premium plus his or her capital

3   contribution.  One or more of the LLC-1s contributed to each of the 93 SIFs managed by Presidio.

4   The LLC-1s, individually or collectively, held a 90% interest in each SIF, each with a tax basis

5   equal to the loan premium plus the client's cash contribution.  Rivkin Decl. ¶ 36.  Presidio, acting as

6   the managing member and TMP held a 1% interest, while Presidio Resources, LLC held the

7   remaining 9% interest in each SIF.

8       At the same time the funds were transferred from the LLC-1 to the LLC-2, the LLC-2 and

9   the original lending bank would enter into an interest rate swap.  DeRosa Decl. ¶10.  It was only at

10  this point in the transaction that the fixed-interest rate was set on the original premium loan.  In the

11  interest rate swap, the above-market rate of interest on the principal amount was swapped for a

12  floating market rate of interest to be paid on the entire amount extended, both the principal and the

13  premium.  *See* Deutsche Bank SOF ¶ 10; DeRosa Decl. ¶¶ 10, 18; DeRosa Rpt. ¶¶ 30, 39, 41–43,

14  67; Weaver Decl., Ex. KB-8 at IRSDBBLIPS00203.  This effectively converted the premium loan

15  into a standard floating rate loan for the full amount advanced.  Smith Decl., Ex. 516 at RBS41441;

16  Weaver Decl. Ex. DDG-5 at HVB000149; Deutsche Bank SOF ¶ 10; DeRosa Decl. ¶¶ 10(e), 14–18,

17  44–51; DeRosa Rpt. ¶¶ 64–70.

18      On behalf of the LLC-2s, Presidio entered into low-risk forward contracts for future delivery

19  of Argentine pesos and Hong Kong dollars.[6]  DeRosa Decl. ¶¶ 21–22; DeRosa Rpt. ¶¶ 92, 104–09.

20  The bank required the loan client to leave on deposit at least 101.25% of the original loan

21  disbursement (principal plus premium).  *See* DeRosa Decl. ¶19.  These funds were rolled into

22

23

24  [5] Section 722 generally governs the calculation of a partner's outside basis in a partnership.  As relevant here, a partners' outside basis in a partnership is equal to the partner's capital contribution less any liability assumed by the partnership on the partner's behalf.  §§ 722, 752.

25  [6] The borrowed funds could be used for a limited number of investments, including (1) Dollar based time deposits at the lending institution of short duration; (2) Fixed income securities of government

26  or corporate issues with maturities of less than 90 days; (3) Interest rate swap transactions for which the lending bank would be the counterparty; and (4) Foreign current spot, forward, or option

27  transactions entered into with the lending bank as the counterparty and requiring settlement in not more than six months.  *See, e.g.*, Larson Decl. Ex. I §§ 1.01 and 7.04(b).

28
                                    No. 04-cv-04264-RS
                                    ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    "synthetic dollar deposits," a low-risk, low-profit investment of off-setting trades in the Euro and

2    U.S. dollar.  DeRosa Decl. ¶ 20.

3          When the client chose to exit the program, the assets received from the transaction would be

4    sold off.  Rivkin Decl. ¶ 37.  The loan would be repaid to the bank with interest, along with a pre-

5    payment penalty and early breakage fee.  Larson Decl. Ex. U.  The pre-payment penalty and early

6    breakage fee were set at the time of the loan swap such that those payments, together with any

7    interest payments made to the bank, equaled the loan premium.  At this time, the LLC-2 was

8    terminated and a small amount or currency or stock was distributed to the client.  *Id.*  Those

9    distributed assets would then be sold, generating a loss that the client would attribute to his or her

10   outside basis in the LLC-2.  Rivkin Decl. ¶19.  The net result, after accounting for management fees,

11   was a tax loss for the client approximately equal to the original loan premium.

12        C.  <u>IRS Investigation</u>

13        The IRS launched an investigation into tax returns associated with BLIPS and other tax

14   strategies promoted by KPMG, Presidio Advisory, and their principals.  *See United States v. Stein*,

15   435 F. Supp. 2d 330, 338 (S.D.N.Y June 26, 2006) *aff'd* 541 F.3d 130 (2d Cir. 2008).  In early 2002,

16   the Service issued summons to KPMG.  In October 2002, the U.S. Senate began its own

17   investigation into the "development, marketing, and implementation of abusive tax shelters" and

18   held a public hearing on the issue in November 2003.  *Id.*

19        In early 2004, the IRS referred the criminal investigation of BLIPS to the DOJ.

20   Subsequently, several KPMG partners were indicted in a criminal tax fraud conspiracy to defraud

21   the IRS.  Makov pled guilty to one count, and Larson and Pfaff were convicted by a jury on twelve

22   counts of attempted tax evasion, ten of which involved BLIPS.  The case against the remaining

23   defendants, including Hasting, was dismissed on the grounds that the government had interfered

24   with their Sixth Amendment rights.  *See United States v. Stein*, 495 F.Supp.2d 390 (S.D.N.Y. July

25   16, 2007).  The present case was stayed from 2005 to June 2011 as a result of those criminal

26   proceedings.

27

28

**United States District Court**
For the Northern District of California

III. LEGAL STANDARD

A. <u>Jurisdiction</u>

These related actions were brought pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), enacted by Congress to achieve consistent treatment of all partners in a partnership. *See* 26 U.S.C. §§ 6221–6233.[7] Where the IRS disagrees with a partner's tax treatment of any partnership item, it must issue a Final Partnership Administration Adjustment ("FPAA") to the TMP of the partnership. § 6223. The TMP then has ninety days in which to file a petition for readjustment. § 6226. Such a petition may be brought in the district court only if the partner deposits with the Secretary of the Treasury the amount by which the tax liability of the partner would be increased if adjustments were made consistent with the FPAA. § 6226(e)(1); *see Schumacher Trading Partners II v. United States*, 72 Fed. Cl. 95, 100 (2004).[8] The court in which such a petition is filed has jurisdiction to determine all partnership items of the partnership for the relevant taxable year, the allocation of such items among the partners, and the applicability of any penalty. § 6226(f).

The IRS determination of the partnership adjustments set forth in the FPAAs is reviewed de novo. *See Murfam Farms, LLC ex rel. Murphy v. United* States, 94 Fed. Cl. 235, 245 (2010). That determination is, however, presumptively correct, and it is the taxpayer's burden to prove the transaction is not a sham. *See Goldberg v. United* States, 789 F.2d 1341, 1343 (9th Cir. 1986); *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1355 (Fed. Cir. 2006).

B. <u>Summary Judgment</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. Proc.

---

[7] All statutory references herein are to Title 26 of the U.S. Code unless otherwise specified.
[8] In this case, both petitioners and intervenors have satisfied this jurisdictional requirement by submitting proof of such deposits, and petitioners do not dispute this court's jurisdiction. Intervenors' arguments concerning the applicable statute of limitations are addressed below.

56(c)(1)(A).  If the movant succeeds, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 322 n.3; *see also* Fed. R. Civ. Proc. 56(c)(1)(B).  A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.  *See id.* at 255.

IV. DISCUSSION

A. Economic Substance Doctrine

The Ninth Circuit applies the "economic substance" doctrine to determine if a transaction was a "sham" that should be disregarded for tax purposes.  *See Keller v. Comm'r*, 568 F.3d 710, 724 (9th Cir. 2009); *Reddam v. Comm'r*, No. 12-72135, 2014 WL 2619692, at *6 (9th Cir. June 13, 2014).  This doctrine asks whether "the taxpayer has shown 1) a non-tax business purpose (a subjective analysis), and 2) that the transaction had 'economic substance' beyond the generation of tax benefits (an objective analysis)."  *Keller*, 568 F.3d at 724 (citations omitted).  Under the objective inquiry, the Court must determine "whether from an objective standpoint the transaction was *likely* to produce economic benefits aside from a tax deduction."  *Casebeer v. Comm'r.*, 909 F.2d 1360, 1365 (9th Cir. 1990) (emphasis added); *see also Black & Decker Corp. v. United States*, 436 F.3d 431, 441 (4th Cir. 2006) (a transaction must "appreciably" affect the taxpayer's beneficial interest in addition to reducing his or her tax).  The subjective inquiry "involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue."  *Bail Bonds by Marvin Nelson, Inc. v. C.I.R.*, 820 F.2d 1543, 1549 (9th Cir. 1987).

In the Ninth Circuit, the objective and subjective inquiries are not applied in a "rigid two-step analysis."  *Casebeer*, 909 F.2d at 1363.  Rather, they "are simply more precise factors to consider in the application of [the Ninth Circuit's] traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses."  *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir. 1988) *abrogated in part on other grounds as recognized by*

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  *Keane v. Comm'r*, 865 F.2d 1088, 1092 n. 8 (9th Cir. 1989); *see also Reddam*, 2014 WL 2619692,

2  at *7.

3          The government's motion focuses on the objective prong.  The government argues, first, that

4  the premium loan structure of the BLIPS investment program served no purpose other than

5  artificially to increase a client's basis in an LLC-2.  Second, it argues the investment strategy served

6  no objective economic purpose other than generating tax losses.  Petitioners focus primarily on the

7  subjective prong of the analysis.  Even taking all inferences in favor of petitioners, the evidence

8  proffered concerning subjective intent is insufficient to overcome the government's evidence that no

9  rational investor would pursue this strategy for any business reason other than tax avoidance.

10          1.      *Premium Loan and Interest Rate Swap*

11          As described above, the tax advantages conferred by BLIPS depend on the characterization

12  of the premium component of the loan package.  The initial loan from the banks to the LLC-1s was

13  structured such that the loan premium always equaled the client's desired capital or ordinary loss.

14  The client, through the LLC-1, then transferred the entire loan proceeds, along with an additional

15  client contribution, to the LLC-2.  A partner's basis in a partnership interest generally increases by

16  contributions of money and property and decreases by the amount of any of his or her liabilities

17  assumed by the partnership.  The clients, however, did not treat the "premium" portion of the loan

18  as a liability assumed by the LLC-2, ostensibly because there was no obligation to repay that

19  amount to the bank.  The client's tax basis in the LLC-2 was therefore reported as the full

20  contribution (loan principal plus premium plus client contribution) less the principal obligation

21  assumed by the LLC-2.  In other words, the client's basis in the LLC-2 was equal to the loan

22  premium plus the client contribution, the latter equal to approximately 7% of the loan premium.

23  According to the government, the sole purpose of the loan structure was simply to create an

24  artificially high tax basis in the LLC-2 for the client.

25          Petitioners proffer three purported business reasons for the premium loan.  First, petitioners

26  argue the loans were used to provide leverage for the SIFs to buy foreign currency contracts.  Both

27  sides agree these were highly leveraged investments.  The government's expert, however, explains

28

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    that only a fraction of the notional amount of these investments would be necessary to keep on

2    deposit as "margin" with the bank, an amount well-within the cash contribution of each client.

3    (DeRosa Decl. ¶¶ 21–27).  The government also offers evidence from officers at the participating

4    banks that the margins required for forward trades of this nature would be covered by the clients'

5    equity contributions.  *See, e.g.,* DB SOF ¶ 8 (Deutsche Bank); DeGiorgio Dep. 241:16–247:10

6    (HVB). [9]  A contemporaneous email sent from a NatWest employee confirming the BLIPS

7    transaction for investor Tom Gonzalez noted that he made a reduced 6.5% capital contribution,

8    observing, "[R]emember that only around 3% of the equity is really needed to fund our margins and

9    spread costs—the rest is fees that Presidio and KPMG get."  Smith Decl. ¶¶ 1 & 5 & Ex. 526

10   (RBX21033).[10]

11        In response, petitioners point to Makov's deposition testimony, where he suggested the loan

12   proceeds provided leverage for the investment strategy.  Makov Dep. 45:22–46:23 ("because we

13   have leverage in this transaction, because the premium loan provides you with leverage, we will

14   then be—have the ability to benefit and amplify the benefit from a devaluation in—in—in Brazil").

15   If anything, Makov's testimony at this point describes a loan in search of a strategy.  *See also*

16   Makov Dep. 139:4–8 ("Again, I was given and I was told that I was . . . to design an investment

17   program such that utilizes a loan and utilizes a premium loan.  In designing the investment program,

18   I made economic sense and I made profit reasons for both of those inputs.").  According to Makov,

19   the notional amount on the forward contracts would typically be 15 times the amount of the client's

20   cash contribution; the loans were, thus, necessary for these "highly leveraged" transactions.  (Makov

21   Dep. 137:1–139:19; see also *id.* 45:22–46:23).[11]  Both parties agree the investments were highly

---

[9] Petitioners object to this evidence, arguing correctly that none of these witnesses can claim personal knowledge of the subject transactions.  The statements do, however, provide additional corroboration of DeRosa's expert opinion as to the general practice and collateral requirements of such transactions.

[10] The email from NatWest is properly considered as a business record.

[11] The government urges the court to disregard Makov's deposition testimony offered in this case in 2005 as he later testified in the separate criminal proceeding that he perjured himself in that deposition.  The government may, of course, proffer Makov's later trial testimony as a basis to impeach any inconsistent statements in his deposition; however, such a credibility determination cannot be made in conjunction with a motion for summary judgment where all inference and credibility judgments must be drawn in favor of the non-moving party.

United States District Court
For the Northern District of California

1  leveraged, but other than Makov's conclusory statement that "a loan and the proceeds of it were

2  needed to satisfy forward contracts," *id.* at 137:17–19, petitioners offer no evidence that the loan

3  proceeds were either necessary as collateral to pursue the investment strategy or actually used as

4  such.  Larson's deposition testimony that "major banks would not permit investors to enter the

5  BLIPS large currency forward contracts without significant collateral on deposit" lacks credibility as

6  he admitted in the same deposition he had no personal knowledge or expertise on the required

7  margin for forward contracts.  *Compare* Larson Dep. 211:10–20 *with* Larson Dep. 162:18–163:25,

8  Weaver Reply Decl. Ex. JL.

9          Second, petitioners argue the banks required investors to make the loan proceeds available to

10  cover losses on the foreign currency contracts in the event of an appreciation event.  As discussed

11  above, the investment strategy was essentially a bet that the foreign currencies would depeg from

12  and *depreciate* against the U.S. dollar.  It was theoretically possible, however, that a currency might

13  depeg and *appreciate* against the U.S. dollar.  The government does not dispute that in such an

14  event, the investor would risk substantial losses in excess of whatever margin the banks required on

15  the contracts.  The risk, according to the government's expert, was remote and readily addressed by

16  hedging such a risk rather than paying the fees and expenses for non-recourse loans to cover the

17  investment risk.  *See* DeRosa Decl. ¶ 35 (suggesting out-of-the money call options to hedge this risk

18  could be obtained for "next to nothing").  Petitioners offer no explanation as to why the banks

19  would require the clients to maintain such large cash balances in order to pursue this strategy or,

20  more relevantly, why any reasonable investor would choose to assume a high cost loan to cover

21  potential losses.  Nor do they explain why the banks would choose to rely on the deposit of *non-*

22  *recourse* loans to cover potential losses.

23          Third, petitioners point to the notion of "convexity," or a benefit to the client of balancing

24  the LLC-2's risk portfolio by placing more interest rate risk early in the seven-year investment

25  program (when the risks associated with the investment strategy were small) and decreasing interest

26

27

28

United States District Court

For the Northern District of California

1    rate risk later (when investment risks were greater).[12]  Weaver Decl. Ex. JL-36 at KPMG006045–46.

2    This is the only rationale offered by petitioners for the premium loan structure itself.  According to

3    the government, this rationale holds water only if the BLIPS participants intended to remain in the

4    program more than 60 days.  The intention, however, was for clients to stay in BLIPS only through

5    the first 60 days.  Rivkin Decl. ¶ 29; 47.  In fact, virtually all of the clients performed as expected

6    and exited BLIPS within that period.  Only two of the 183 taxpayers who engaged in BLIPS

7    transactions remained past 60 days; neither made any additional capital contributions thereafter and

8    each withdrew at day 120.  Gee Decl. ¶¶ 4–6; DeRosa Decl. ¶ 11; DeRosa Report ¶ 30 & n.5.

9         In any event, the front-loaded aspect of the loan was ameliorated by the swap between the

10   bank and the LLC-2.  As recounted above, in each swap the bank agreed to pay the LLC-2 a fixed

11   interest rate on a notional amount equal to the stated principal of the original loan.  In turn, the LLC-

12   2 agreed to make interest rate payments at a floating rate on a notional amount equal to the stated

13   principal of the loan plus the premium.  Upon termination of the swap, the LLC-2 agreed to make a

14   payment equal to the premium amount.  The end result was a floating rate loan with a principal

15   amount equal to the funding amount (stated principal plus premium), equivalent to a standard

16   commercial loan for the funding amount.  The loan swap, along with other features of the BLIPS

17   transactions, differentiates the tax scheme at issue in this case from that at issue in *Klamath*

18   *Strategic Investment Fund, LLC v. United States (Klamath I)*, 440 F. Supp. 2d 608 (E.D. Tex. 2006),

19   in which the district court, considering a similar premium loan product, determined that neither the

20   loan premium nor the prepayment amount were "liabilities" under the statute governing tax

21   treatment of partnership liabilities.  *Klamath I* did not consider the issue presented here of whether a

22   premium loan carried any economic substance in the context of a transaction like BLIPS.  Other

23   than arguing that such loans are legal—a point not disputed by the government—petitioners offer no

24   plausible economic explanation for this loan structure in the context of the BLIPS transactions.

25        2.    *Investment Strategy*

26   _____

27   [12] As recounted above, the investment aspect of the BLIPS program consisted of three stages: stage one would last 60 days, stage two would last 120 days, and stage three would last the balance of a seven year term.  Rivkin Decl. ¶ 28.

28

United States District Court
For the Northern District of California

1      The government further argues the currency trading component offered no realistic chance of

2   investor profit in light of the speculative nature of the investments, the high costs and fees, and the

3   structure that encouraged investors to exit after the initial 60-day period.  By contrast, petitioners

4   insist the currency trading aspect offered a real opportunity for profit.  Indeed, they note, the

5   Argentine peso did break from the U.S. dollar just a few years after the investments in question.

6   While Makov turned out to be half correct in his belief that the two designated currencies would

7   (eventually) devalue and break from their pegs, the structure of the transactions did not encourage

8   the kind of long-term investment necessary to realize economic gains.[13]  Optimism in investments is

9   appropriate and does not subject an investor to tax penalties; the speculative nature of the

10  investment, however, must not be "so great as to cast doubt on [his or her] profit motive."  *Sacks v.*

11  *Comm'r.*, 69 F.3d 982, 991 (9th Cir. 1995).  The suggestion that investors hoped a particular foreign

12  currency would break from its U.S. dollar peg within sixty days of entering the investment simply

13  stretches the bounds of optimism too far and undermines any claim of a real economic purpose.

14      The standard by which to judge the economic substance of a transaction is not that it merely

15  be *possible* to profit, but rather that the transaction be *likely* to result in economic benefits.  *See*

16  *Casebeer*, 909 F.2d at 1365; *Bail Bonds*, 820 F.2d at 1549.  As the Ninth Circuit has explained, this

17  is a "pragmatic total inquiry" that considers the potential magnitude and probability of any profits or

18  losses as well as how such investment returns would be reported for tax purposes.  *Reddam*, 2014

19  WL 2619692, at *8.  In *Reddam*, the court upheld the tax court's finding that a transaction lacked

20  economic substance where "the magnitude of even the most optimistic gain is dwarfed by the

21  magnitude of the tax loss it was *designed* to generate and the strong possibility of a pretax loss."  *Id.*

22  Showing that it was theoretically feasible to profit as a result of purchasing the BLIPS investment

23  product, therefore, does not satisfy petitioners' burden.  The government's expert amply

24  demonstrates the remote likelihood of any profit during such a short investment window, and

25

26  ────────────────
    [13] The Ninth Circuit recently upheld the tax court's conclusion in a similar case that "the mere hint
    of future profitability"—even a 10 or 25% likelihood—did not compel the conclusion that an
27  investment was "likely" to produce benefits aside from substantial capital losses.  *Reddam*, 2014
    WL 2619692, at *6.

28
                                                        No. 04-cv-04264-RS
                                                        ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1   petitioners offer no contradictory evidence.  Although neither party offers evidence directly

2   comparing BLIPS to the tax strategy contemplated by the Ninth Circuit in *Reddam*, it appears the

3   BLIPS transactions offered a *much* lower probability of correspondingly greater profit.

4          Petitioners rely on *Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995) to argue that, just

5   because an investment is speculative, does not mean that it is a sham.  In *Sacks*, the Ninth Circuit

6   reversed the tax court's disallowance of depreciation deductions and tax credits on the basis that the

7   transactions were shams.  *Id.* at 983.  In so holding, the Ninth Circuit noted that Sacks had a

8   personal obligation to repay the loan, the tax benefits he obtained were the result of the

9   Congressional incentives to invest in alternative energy, and the underlying business of putting solar

10  water heaters in consumers' homes was genuine.  *Id.* at 988.  The court further noted that "[n]on-

11  recourse financing is a common indicator of a sham transaction."  *Id.*  Unlike in *Sacks*, the loans at

12  issue in this case were non-recourse and there was no non-paper business underlying the transaction.

13  Although *Sacks* confirmed that a transaction does not become a sham simply because its (potential)

14  profitability is based on after-tax rather than pre-tax projections, the BLIPS transactions simply

15  were not likely to profit on either a pre- or post-tax basis.  Petitioners' reliance on this precedent is

16  therefore inapt.

17         Petitioners also rely on *Northern Indiana Public Service Company v. Commissioner*, 115

18  F.3d 506 (7th Cir. 1977), in which the Seventh Circuit affirmed a finding that a transaction

19  involving a foreign corporation was not a sham.  The court noted the entity was "managed as a

20  viable concern" and "conducted recognizable business activity—concededly minimal activity, but

21  business activity nonetheless."  *Id.* at 513.  Petitioners argue that here, as in *Northern Indiana*, the

22  SIFs were appropriately managed and conducted business transactions, however minor, in the form

23  of making foreign currency investments.  A tax avoidance motive, they conclude, is therefore "not

24  inherently fatal to a transaction."  *Id*. at 511.  The Seventh Circuit's analysis, however, focused

25  primarily on the meaningful economic activity engaged in by entities in question; here, the only

26  economic transactions entered into by the SIFs were for the purpose of maintaining the façade of

27  economic activity.  The duration of the investments, the source of investment money, and the

28

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

14

structure of the loans belie any true economic substance.  The fact that these LLC-1s and SIFs

complied with the proper corporate form does not endow the transactions with economic

substance.[14]

   3.   *Subjective Inquiry*

      In analyzing the partnership's intent, "objective indicia" of an intent to profit may be

considered.  *See Wolf v. Comm'r*, 4 F.3d 709, 713 (9th Cir. 1993).  Here, petitioners point to various

corporate records demonstrating that the partnerships were formed under state laws and maintained

proper records.  Evidence of corporate form alone, however, is insufficient to demonstrate an

economic purpose as it may just as likely reflect an intent to disguise a transaction's true purpose.

*See e.g., Gregory v. Helvering,* 293 U.S. 465, 469 (1935) ("a transaction with no economic effects,

in which the underlying documents are a device to conceal its true purpose, does not control the

incidence of taxes.").  In any event, proper corporate form indicates nothing about the likelihood of

producing economic benefits.

      As subjective indicia of intent to profit, petitioners point to statements by the principals of

Presidio suggesting they intended to generate profits from the BLIPS investment strategy and

believed they could.  *See, e.g.*, Larson Dep. 78:21–79:16, 202:20–203:10, 305:23–206:15; Makov

Dep. 79:10–84:12.  In the face of overwhelming evidence to the contrary, however, these self-

serving declarations are insufficient to support a finding of subjective intent to profit.  So, too, are

the various marketing representations to investors suggesting that BLIPS was designed to generate

significant investment returns insufficient to establish subjective intent, particularly when agents of

---

[14] The government further argues that because petitioners acknowledged in other forums that the BLIPS transactions are structurally equivalent to those on which courts have previously ruled, they are estopped from re-litigating those issues in this case as well.  A court in this district relied on collateral estoppel in holding that the question of whether the BLIPS transactions lacked economic substance was actually and necessarily decided in the criminal prosecution.  *See Princeton Strategic Inv. Fund, LLC, v. United States*, C-04-04310 JW, 2011 WL 6176221 at *6 (N.D. Cal. 2011) ("The convictions of Pfaff and Larson, and the guilty plea of Makov, therefore conclusively determine that none of Petitioners' controlling managers had a legitimate business purpose for the BLIPS transaction.  From that, it necessarily follows that Petitioners lacked a business purpose for the transaction.").  While it is not necessary to rely on collateral estoppel in this matter, it is instructive to note that courts have previously concluded in similar cases the BLIPS transactions lacked economic substance.

1   the BLIPS promoter KPMG conducted training sessions at which they acknowledged investment

2   returns were not the true goal in marketing BLIPS.  Furthermore, the fact that investors sought to

3   "invest" under the BLIPS strategy immediately after realizing substantial gains suggests the

4   investors too were primarily motivated by the product's tax benefits.  Finally, the nearly universal

5   exodus of investors at the 60-day mark belies any subjective intent to pursue an economic profit

6   from this schedule.

7            Whatever limited questions might remain as to the partners' subjective intent are insufficient

8   to "affect the outcome of this suit" and thereby defeat the government's motion for summary

9   judgment.  *Anderson*, 477 U.S. at 248.  The government is not required to prove the transaction

10  lacks both objective economic substance and a subjective business purpose.  *Coltec Indus., Inc. v.*

11  *United States*, 454 F.3d 1340, 1355 n.14 (Fed. Cir. 2006).  As the Federal Circuit has explained,

12  "[A] lack of economic substance is sufficient to disqualify the transaction without proof that the

13  taxpayer's sole motive is tax avoidance."  *Id.* at 1355.  The petitioner's failure to satisfy the

14  objective prong, coupled with only the slimmest evidence regarding the partnership's subjective

15  intent, is fatal for petitioners.  The government is therefore entitled to summary judgment on this

16  issue and a determination that the BLIPS transactions should be disregarded for tax purposes as

17  provided in the FPAAs.

18       B.  Statutory Penalties

19            Under § 6226(f), a district court has jurisdiction to determine "the applicability of any

20  penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item,"

21  even though a penalty may not be imposed and assessed until the partner has a chance to present his

22  or her individual defenses at the partner level.  *United States v. Woods*, 134 S. Ct. 557, 564 (2013).

23  "The partnership-level applicability determination, we stress, is provisional: the court may decide

24  only whether adjustments properly made at the partnership level have the *potential* to trigger the

25  penalty.  Each partner remains free to raise, in subsequent, partner-level proceedings, any reasons

26  why the penalty may not be imposed on him specifically."  *Id.*  (emphasis added).

27

28

United States District Court

For the Northern District of California

1    Here, the IRS has determined that accuracy-related penalties should be applied for

2    negligence, I.R.C. § 6662(b)(1); substantial understatement of tax, § 6662(b)(2); and substantial

3    valuation misstatement, § 6662(b)(3).  These penalties are not cumulative; the maximum accuracy-

4    related penalty imposed on any portion of an underpayment may not exceed 20% (or 40% on the

5    portion attributable to a gross valuation misstatement), regardless of whether the underpayment is

6    attributable to multiple types of misconduct.  *See* Treas. Reg. § 1.6662–2(c) (as amended in 2003);

7    *Stobie Creek Investments, LLC v. United States*, 82 Fed. Cl. 636, 702–03 (Fed. Cl. 2008) aff'd, 608

8    F.3d 1366 (Fed. Cir. 2010).  Thus, each of the penalties is asserted in the alternative, with the

9    maximum potential penalty equal to 40%.  The government moves for a finding that both the

10   negligence and substantial valuation misstatement penalties apply to the partnerships as a matter of

11   law and a finding that BLIPS was a tax shelter for purposes of any subsequent underpayment

12   penalty assessment at the partner level.

13   It is an absolute defense to accuracy-related penalties "with respect to any portion of an

14   underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer

15   acted in good faith with respect to such portion."  I.R.C. § 6664.  This is, however, a partner-level

16   defense not applicable to the instant proceeding.  *See, e.g., NPR Investments, L.L.C. ex rel. Roach v.*

17   *United States (NPR)*, 740 F.3d 998, 1014 (5th Cir. 2014) (district courts lack jurisdiction to

18   adjudicate individual partners' defenses, including "reasonable cause," in a partnership proceeding).

19       *1.    Negligence*

20   If a taxpayer underpays his or her tax due to negligence, a 20% penalty applies.  I.R.C.

21   § 6662(b)(1); Treas. Reg. § 1.6662-3(a).  In this partnership-level proceeding, the issue is whether

22   the partnership itself was negligent.  *See Arbitrage Trading v. United States*, 108 Fed. Cl. 588, 598,

23   608 (2013); *Tigers Eye Trading, LLC v. Commissioner*, 138 T.C. 67, 89–91, 133–34 (2012).

24   Negligence includes the failure "to make a reasonable attempt to comply with the provisions of the

25   internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return."

26   *See* § 6662(c); Treas. Reg. § 1.6662-3(b)(1).  The intent of a partnership is determined by the intent

27   of its general partners.  *Wolf v. C.I.R.*, 4 F.3d 709, 713 (9th Cir. 1993).  Here, the Court must look to

28

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

17

United States District Court
For the Northern District of California

the intent and knowledge of Presidio's principals—Larson, Pfaff, and Makov—to assess the applicability of the penalty for negligence.

The government suggests that negligence may be premised on a finding that Presidio's principals knew the currency transactions had minimal possibility of generating a profit, that the loan served no purpose, and that the partnership was a 60-day sham. Determinations as to the principal's profit motives and intent are factual determination not amenable to summary judgment. Although the partners' subjective intent is not sufficient to overcome the lack of any objective economic purpose in the BLIPS program, that does not equate to an absence of any genuine issue of material fact as to the principals' subjective intent and knowledge about the transactions. The government is therefore not entitled to a finding at this juncture that the penalty for negligence applies at the partnership level.

### 2. Substantial Valuation Misstatement

A 20% penalty applies when a taxpayer underpays tax due to a "substantial valuation misstatement." *See* § 6662(b)(3). A substantial misstatement occurs when the taxpayer claims on a tax return that the value of, or basis in, property is at least 200 percent of the actual value. § 6662(e)(1)(A) (2000); Treas. Reg. § 1.6662-5(e)(1) (2000). If the taxpayer's claimed basis is at least 400% of the actual value, the misstatement is a "gross" one, and the amount of the penalty increases to 40%. § 6662(h)(1). If the statutory threshold is met, the penalty is mandatory and automatic. *Stobie Creek Invs. LLC v. United States*, 82 Fed. Cl. 636, 704 (Fed. Cl. 2008), *aff'd* 608 F.3d 1366 (Fed. Cir. 2010).

The government argues that because there was no economic substance to the purported "premium" loan transaction, the court should (1) reduce the capital contributions attributed to the investor to zero; (2) adjust the LLC-2's liabilities to reflect the assumption of an obligation to repay the full funding amount; or (3) reduce the investor's capital contributions to the amount of the participant's cash contribution. As a result, the government asks the court to hold as a matter of law that the 20% valuation misstatement penalty applies and that, for the three entities against which the

IRS has asserted a gross valuation misstatement penalty (Capitol, Churchill, and Democrat SIFs), the court should impose the 40% penalty.

Petitioners' sole response to the government's request for a finding on the misstatement penalty is to refer to their arguments concerning negligence, asserting conclusorily that "[f]or similar reasons the gross valuation misstatement penalty cannot be applied as well." (Response, at p. 28.) Unlike the penalty for negligence, however, it is not necessary to resolve any factual questions of intent in order to find that the misstatement penalty applies, provisionally, at the partnership level. If the partners have individual defenses, they may assert those defenses at the separate and subsequent partner-level proceedings. The government is therefore entitled to a finding that the substantial valuation penalty applies at the partnership level (at either 20% or 40%, as provided in the relevant FPAAs), subject to any defenses that may apply at subsequent partner-level proceedings.

### 3. Substantial Understatement of Tax

A 20% accuracy-related penalty applies when a taxpayer substantially understates, and therefore underpays, the amount of tax due. I.R.C. § 6662(b)(2). Although the amount of the penalty is calculated at the partner level, the government is asking for a finding that the LLC-2s were "tax shelters," as defined in Treasury Regulation § 1.662-4(g). Such a finding would limit the defenses available to the taxpayer at any subsequent partner-level proceeding. § 6662(d)(2)(C)(iii).[15] The test for whether a partnership is a "tax shelter" within the meaning of § 6662(d)(2)(C) is whether, "based on objective evidence," the "principal purpose" of the partnership "is to avoid or evade [f]ederal income tax." § 1.6662-4(g)(2)(i). This objective determination is appropriately made at the partnership level, see § 1.6662-4(f)(5), as the objective purpose of the partnership will not differ between partners, regardless of any individual's subjective intent.

---

[15] For such items, the taxpayer must be able to show both that there was substantial legal authority for the position it took and that it reasonably believed its position was correct. See § 6662(d)(2)(C)(i); Treas. Reg. § 1.6662-4(g)(1)(i) (2000).

United States District Court
For the Northern District of California

1    Petitioners did not respond to the government's argument that, based on objective evidence,

2    the principal purpose of the LLC-2s was to avoid or evade federal taxes. Instead, petitioners

3    challenge assessment of the penalty on the basis that the partners reasonably believed, based on

4    substantial authority, that repayment of the loan premium was contingent under § 752 and,

5    therefore, need not be reflected in the partners' outside bases of the LLC-2s. As to the threshold

6    issue of whether the LLC-2s were tax shelters, presumably petitioners' position rests on the same

7    arguments addressed above concerning the economic substance doctrine and is equally unpersuasive

8    here.

9    Whether the partners reasonably believed that repayment of the loan premium was

10   contingent under § 752 is a defense which must be asserted, if at all, at any subsequent partner

11   proceeding. *See NPR*, 740 F.3d at 1014. However, the question of whether "objective substantial

12   authority" existed for that position is a determination that may properly be made at the partnership

13   level. *See id.*, at 1012. On that issue, petitioners argue they should be entitled to rely on opinion

14   letters regarding BLIPS from KPMG and Brown & Wood. A tax opinion itself, however, cannot

15   provide substantial authority; the appropriate inquiry is whether the authorities upon which the

16   opinion letter rests provide substantial authority. Treas. Reg. § 1.6662–4(d)(3)(iii); *NPR*, 740 F.3d

17   at 1013 & n.63. For example, the opinion letter from KPMG relies on the tax court's opinion in

18   *Helmer v. Commissioner*, 34 T.C.M. (CCH) 727 (1975), for the proposition that contingent

19   obligations (here, the obligation to repay the loan premium through breakage and prepayment fees)

20   are not liabilities under I.R.C. § 752 and thus do not affect the partner's outside basis in the

21   partnership. Rivkin Decl., Ex. 20-B-2 at p. 24. Other courts, however, have concluded that *Helmer*

22   is inapplicable in this situation because that decision—like that issued in *Klamath I*—does not

23   address a transaction found to be lacking in economic substance or where the partnership lacked a

24   profit motive. *See, e.g.*, *NPR*, 740 F.3d at 1013 & n. 67. KPMG also cites *LaRue v. Commissioner*,

25   90 T.C. 465 (1988), for the proposition that an obligation is not incurred and taken into account until

26   the tax year in which all events have occurred to fix the amount of the obligation. Rivkin Decl., Ex.

27

28

United States District Court
For the Northern District of California

1    20-B-2 at p. 28.  *LaRue* is also inapplicable as all of the BLIPS transactions were, by design, entered

2    and closed within a single tax year.

3           In short, petitioners offer no basis to contest the government's position that the LLC-2s were

4    "tax shelters," as defined by the relevant regulations, nor have they demonstrated that their tax

5    treatment of the partnership items rested on substantial authority at the time the relevant returns

6    were filed.  The government is therefore entitled to a finding that the LLC-2s constituted tax

7    shelters.

8        C.  Statute of Limitations

9           Intervenors Reddam and Gonzales each separately move for summary judgment, arguing the

10   IRS failed to obtain a valid consent to extend the statute of limitations and thus the FPAAs are

11   untimely as to each of them.[16]  The government also moves for summary judgment against the

12   intervenors, seeking a finding that neither is entitled to a statute of limitations defense at the

13   partnership stage.

14          The statute of limitations is an affirmative defense.  Absent some exception, the IRS has

15   three years from the date a partnership tax return is filed or due (if the return is filed early) to make

16   an assessment or issue an FPAA determining additional tax liability with respect to a partnership

17   item.  § 6229(a).  If the taxpayer makes a prima facie showing that the FPAA was mailed after the

18   period had run based on the filing date or due date of the partnership return, the burden of

19   production shifts to the IRS to show that the action is not barred by, for example, presenting

20   evidence that the taxpayer consented to extend the period.  *See Madison Recycling Associates v.*

21   *C.I.R.*, 295 F.3d 280, 286 (2d Cir. 2002).  Here, the parties agree that the FPAAs were mailed after

22   the period had run.  The government, however, claims three exceptions apply here:  consent by the

23   TMP to extend the statutory period, consent by the individual taxpayers, and the fraud exception.[17]

24   _____

25   [16] Reddam styles his motion as one to dismiss or, in the alternative, for summary judgment.  His
     motion, which relies on evidence beyond the face of the petition shall be treated here as a motion for
     summary judgment under Rule 56 of the Federal Rules for Civil Procedure.

26   [17] The fraud exception provides that "if any partner has, with the intent to evade tax, signed or
     participated directly or indirectly in the preparation of a partnership return which includes a false or

27   fraudulent item" then tax may be assessed against that partner at any time and against "all other
     partners" within six years of the date the partnership return was filed or due.  § 6229(c).  Because

28                                                                        No. 04-cv-04264-RS
                                                                ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

                                              21

United States District Court

For the Northern District of California

1   The burden ultimately rests on the taxpayer to show that any such exception is ineffective or

2   inapplicable.  *Id.*  As above, summary judgment is appropriate only "if the movant shows that there

3   is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

4   law." Fed. R. Civ. Proc. 56(a).

5       1.   *Reddam and Clarence Ventures*

6           a.   Factual Background

7       Carl Hasting, a tax partner at KPMG, was involved in developing, marketing, and selling the

8   BLIPS investment strategy to high net worth individuals, including J. Paul Reddam.  Pursuant to the

9   BLIPS strategy, Reddam formed Clarence Ventures, LLC ("Clarence Ventures").  Reddam Decl. in

10  Support of Motion to Participate, ¶ 3.  Clarence Ventures became a partner in Foraker Strategic

11  Investment Fund, LLC ("Foraker SIF"), one of the sixty-three SIFs on behalf of which Case No. C-

12  05-1123 was brought by Presidio.  *Id.*  Presidio was the TMP for Foraker.  *Id.* ¶ 11; Munk Decl. Ex.

13  3 at 38.

14      On April 13, 2000, Foraker timely filed its partnership tax return for taxable year 1999.

15  Munk Decl. Ex. 5.  On October 16, 2000, Reddam timely filed his individual tax return for taxable

16  year 1999, which included losses he sustained as a result of his participation in BLIPS.  Munk Decl.

17  Ex. 6.  Based on these filings, the statute of limitations for the IRS to issue an FPAA to Foraker

18  would have expired on April 15, 2003, while the statute of limitations to seek a deficiency payment

19  against Reddam would have expired on October 16, 2003, absent valid consents to extend these

20  periods.

21      In light of the complexity and magnitude of the investigations into BLIPS and related tax

22  strategy programs, the IRS sought extensions to the limitations period from Presidio for the various

23  SIFs, including Foraker.  *See* Munk Decl. Exs. 7–9; Diaz Decl. ¶ 10.  To that end, it obtained

24  consents from Alan Smith, president of HSM Growth Holdings, Inc. ("HSM Growth"), purportedly

25

26

27  the individual and TMP consents to extend are sufficient to resolve this issue, as explained below, it
    is not necessary to address the fraud exception.

28                                               No. 04-cv-04264-RS
                                                 ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

1   signing as the member manager for Presidio and, therefore, the TMP for Foraker SIF.  Munk Decl.

2   Exs. 10–12 (collectively extending the statutory period to December 31, 2005).

3          The IRS also sought extensions from the individual partners.  *See* Munk Decl. Exs. 7–9.  On

4   December 19, 2002, CPA Steven Hawkins, acting with Reddam's power of attorney before the

5   Service, signed IRS Form 872-1 on Reddam's behalf, extending the limitations period for Reddam's

6   1999 tax return from October 16, 2003 to December 31, 2003.  Munk Decl., Ex. 13.  In January

7   2003, Hasting submitted a letter to the IRS stating that Hawkins was not authorized to execute the

8   extension and that Hasting, on behalf of Reddam, would like to withdraw the form and instead

9   consent to a more restricted extension.  Munk Decl. Ex. 14.  This more restricted extension, signed

10  by Reddam himself on April 15, 2003, resulted in a limitations period ending June 30, 2004.  Munk

11  Decl. Ex. 17.  Reddam signed an additional five consents, which collectively extended the statute of

12  limitations to June 30, 2008 with respect to his participation in the BLIPS transactions.  Gee Decl.

13  Exs. RG-14, RG-15, RG-16, RG-17, RG-18.

14         As previously noted, the government began a criminal investigation in 2002 for tax fraud,

15  targeting KPMG, Presidio Advisory, and their principals.  The ongoing criminal proceedings,

16  Reddam argues, created a conflict of interest between Presidio and the SIFs that invalidates any

17  consent subsequently signed by Smith.  Reddam further argues the investigation of KPMG created a

18  conflict of interest that invalidates any subsequent extensions signed by him under the advisement

19  of Hasting, a KPMG employee.

20         In support of this argument, Reddam relies on *Transpac Drilling Venture 1982-12 v.*

21  *Commissioner*, 147 F.3d 221, 225 (2d. Cir. 1998) in which the Second Circuit held that, because the

22  TMPs were acting under a serious conflict of interest when they consented to extend the statute of

23  limitations for the partnership, the extensions did not bind the limited partners.  *Id.* at 227–28.  The

24  court came to this conclusion based on the finding that the IRS knew the TMPs had a "powerful

25  incentive to ingratiate themselves to the government—be it the civil department of the IRS, the

26  criminal division, or even the United States Attorney's Office."  *Id.* at 227.

27

28                                                              No. 04-cv-04264-RS
                                               ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    The *Transpac* case, however, is distinguishable from the present matter.  In that case, the

2    IRS first sought consents to extend from the individual partners; only after those individuals

3    declined to so consent did it seek consents from the TMPs.  *Transpac*, 147 F.3d at 227.

4    Additionally, when the limited partners inquired into the status of the civil audit, the IRS told them

5    to consult their TMPs, which had been ordered not to disclose the existence of the criminal

6    proceedings against them.  *Id.*  Thus, the statute of limitations was extended against the individual

7    partners' express will and their efforts to stay abreast of the investigation were actively thwarted by

8    the government.  Here, by contrast, Reddam personally agreed to extend the statute of limitations on

9    several different occasions.  Absent is any evidence the IRS ever sought to preclude Presidio or

10   other investigatory targets from disclosing the fact of investigation to their clients, nor any

11   indication that the IRS attempted to restrict the advisors from whom Reddam sought guidance and

12   counsel.

13   The existence of a criminal investigation alone does not create a disabling conflict of

14   interest.  *See, e.g., Phillips v. Comm'r.*, 272 F.3d 1172, 1173 (9th Cir. 2001) (holding "there is no

15   automatic termination of TMP status by virtue of [a criminal] investigation."); *Madison Recycling*

16   *Associates v. Comm'r.*, 295 F.3d 280, 288 (2d Cir. 2002) (finding the existence of a criminal

17   investigation by the IRS does not automatically disqualify a TMP from negotiating or entering into

18   agreements with the IRS, but rather, such disqualification is a fact-based inquiry).  Reddam has

19   pointed to no specific facts to suggest Smith acted with intent to "ingratiate" himself or Presidio

20   with the government.  He further fails to explain how Presidio's consent was in conflict with his

21   own, or that of the many other limited partners who signed consents to extend the statute of

22   limitations.

23   It is not necessary in this instance to rely upon the consents signed by Smith because

24   Reddam himself consented to several extensions, first through his accountant, Hawkins, and then

25   personally.  Reddam contends that the extensions he personally signed are invalid because he was

26   advised to sign by Hasting, who had a conflict of interest as a result of being under criminal

27   investigation.  The cases upon which Reddam relies concerning conflicts of interest contemplate

28

United States District Court

For the Northern District of California

situations in which a lawyer represented a criminal defendant, not cases in which a lawyer acts as an advisor. *See, e.g. United States v. McLain*, 823 F.2d 1457, 1463–64 (11th Cir. 1987) *overruled on other grounds by United States v. Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989); *United States v. Levy*, 25 F.3d 146, 156–57 (2d Cir. 1994). These cases focus on the Sixth Amendment right to competent counsel in the criminal context, a constitutional right that does not extend to individuals involved in civil actions. *See United States v. Sardone*, 94 F.3d 1233, 1236 (9th Cir. 1996). In any event, Reddam signed a waiver regarding KPMG's potential conflict of interest in light of the ongoing IRS investigation dated February 4, 2003—two months before Reddam signed his consent to extend.

Nevertheless, Reddam insists his waivers are not valid because the government did not advise him of the potential conflict nor seek his waiver of that conflict. For example, Reddam points to a 2003 email in which the IRS supervising manager advised the revenue agents:

> For taxpayers who filed a Form 1040, it is strongly recommended that the consent be signed by the relevant taxpayers (i.e., generally the individuals participating in the shelters). Because of the potential conflict of interest, you should not accept a consent that is executed by a POA who is affiliated with any firm that promoted or marketed any tax shelter that is reflected on the relevant tax return. If any POA insists on signing the consents, please contact me immediately for further instructions.

Munk Dec., Exhibit 15 at 2 (emphasis added); *see Leatherstocking 1983 Partnership v. C.I.R.*, 296 Fed. Appx. 171, 173 (2d Cir. 2008) (finding consents invalid where the government knew the TMP was operating under a conflict of interest arising from an ongoing criminal investigation at the time he consented to an extension). While perhaps the IRS could have informed Reddam of these facts, it does not follow that the statute extensions signed by Reddam himself are invalid. Reddam points to no case law to support the proposition that a mere advisor may create a conflict of interest so great as to invalidate a contractual agreement with the government. Indeed, if the government were required to inquire into whether an individual had been advised prior to accepting a signed document, it would never be able to rely on contractual extensions of the statute of limitations. In fact, in making his recommendation, Hasting made clear that agreeing to extend the statute would forestall the issuance of an FPAA and avoid sending parties prematurely into court. Weaver Decl.

Ex. JW-1.  There is no evidence this advice was given based on the interests of Hasting, rather than Reddam.

Moreover, Reddam's behavior before and after receiving the allegedly improper advice to sign the statutory extensions ratifies his consent.  Hawkins, who is not alleged to have any conflict, signed a consent to extend the limitations period on Reddam's behalf.  When Hasting later rescinded that consent, he insisted on making it more *narrow*, and thereby more favorable to Reddam.  Additionally, Reddam subsequently signed an additional five consents.  There is no indication that he relied on Hasting's advice in choosing to sign any consent to extend the statute.  *See, e.g.*, Reddam Dep. 266:21–267:12 ("I don't recall who told me to sign it, so I don't recall [Hastings] exerting any kind of influence. . . . I certainly don't recall circumstances forehand, including anybody pressuring me.").  Rather, Reddam demonstrated his assent to the terms of the extension by attaching his signature to the consents.

Reddam has failed to meet his burden to prove that the consents to extend the statute of limitations were invalid with respect to him or Clarence Ventures, and that the FPAAs were therefore untimely. [18]  As a result, Reddam's motion for summary judgment must be denied and the government's corresponding motion for summary judgment granted as to him.

2.    *Gonzales and Birch Ventures*

a.   Background

Tom Gonzales co-founded an internet company that was sold in early 2000, resulting in the realization of both long-term and short-term capital gains.  Gonzales shortly thereafter met with his accountant and Larson about participating in the BLIPS transactions.  Grande Decl. Ex. 91, Gonzales 2003 Dep. 13–16.  He recounted being told that the transaction could produce profits as well as tax benefits.  *Id.* at 19–20.  Gonzales thereafter formed the wholly-owned Birch Ventures, LLC ("Birch"), which obtained a premium loan and proceeded to invest both the loan proceeds and Gonzales's own capital contribution in the Logan Strategic Investment Fund, LLC ("Logan SIF"), a

---

[18] Reddam also joins the arguments raised by Gonzales concerning Alan Smith's authority to sign consents on behalf of Presidio.  For the reasons set forth below, these arguments are unavailing.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   limited liability company that formed and was dissolved less than six months later.  Logan SIF is

2   one of the twenty-two SIFs on behalf of which Case No. 05-2835-RS was brought by Presidio.

3   Logan SIF designated Presidio as its TMP.  On April 16, 2001, Logan SIF filed its 2000 partnership

4   return.  Grande Decl. Ex. 50.  Based on this date of filing, the statute of limitations for the IRS to

5   issue an FPAA would have expired April 16, 2004, absent a valid consent to extend.

6           On December 1, 2003, the IRS obtained a consent to extend the statute of limitations as to

7   Logan SIF signed by Alan Smith as president of HSM Growth, purportedly the member manager for

8   Presidio and thereby the TMP for Logan SIF.  Grande Decl. Ex. 2.  On February 2, 2004, Smith

9   signed a second consent, this time as president of HSM Industries Inc. ("HSM Industries"), again

10  purportedly on behalf of Presidio and Logan SIF.  *Id.*  Smith continued to sign subsequent consents,

11  extending the statute of limitations with respect to Logan's 2000 tax year through to December 31,

12  2005.  Grande Decl. Ex. 5–7.  The IRS issued an FPAA to Presidio for Logan SIF's 2000 tax year

13  on April 28, 2005.  Supp. Gee Decl. Ex. M.  A generic copy of the notice, addressed to the "Tax

14  Matters Partner" was mailed to the address of record for Logan SIF.  Supp. Gee Decl. Ex. N.

15          Gonzales filed his individual tax returns for the 2000 tax year on July 16, 2001.  Grande

16  Decl. Ex. 74.  He disclosed the details of his participation in BLIPS in April 2002, after the IRS

17  offered to waive accuracy-related penalties associated with the underpayment of tax.  *See* Suppl.

18  Gee Decl. Ex. K.  On December 2, 2003 and again on October 20, 2004, Gonzales signed a consent

19  to extend the time to assess tax as well as tax attributable to items of a partnership for his 2000

20  income tax year, extending the statute of limitations through to June 30, 2005.  Gee Decl. ¶¶ 83–84;

21  Grande Decl. Ex. 3, 8.  The IRS issued a notice of deficiency on April 14, 2005.[19]

22          b.   Individual Consent

23

24  _____

25  [19] Gonzales filed a petition in the United States Tax Court, which, pursuant to agreement of the
    parties, found that Gonzales had a deficiency in the amount of $105,985 for the 2000 tax year.
    Grande Decl. Ex. 9.  That decision did not reach the alleged deficiencies related to Logan SIF, as the
26  agreement provided that the "tax treatment of Gonzales's partnership items relating to Logan will be
    resolved in a separate partnership proceeding conducted in accordance with the TEFRA partnership
27  proceedings."  *Id.*  There has, therefore, been no adjudication of the relevant partnership items in the
    tax court.

28                                                          No. 04-cv-04264-RS
                                                ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

1    As with Reddam, the IRS obtained consents to extend the statutory period from both the

2    individual taxpayer and the TMP.  Gonzales presents three challenges to the consents he personally

3    signed on December 2, 2003, and October 20, 2004.

4    First, Gonzales argues these consents do not extend the statute of limitations with respect to

5    partnership items of Logan because Gonzales, as opposed to Birch Ventures, was never a partner in

6    Logan.  The tax code, however, defines "partner" for these purposes as either "a partner in the

7    partnership" or "any other person whose income tax liability under subtitle A is determined in whole

8    or in part by taking into account directly or indirectly partnership items of the partnership."  I.R.C.

9    § 6231(a)(2).  Gonzales apparently concedes this point, as he does not address the government's

10   response in his reply.

11   Second, Gonzales argues his consent is invalid because the IRS never obtained a conflict of

12   interest waiver concerning his accountant, Steve Smith.  Although Steve Smith represented

13   Gonzales during the audit that flowed from his 2000 tax return, Gonzales had designated different

14   representation before signing the consents.  Gonzales offers no evidence that his decision to consent

15   to extend time was influenced by Steve Smith notwithstanding this latter designation, which

16   explicitly revoked all prior "power of attorney" declarations with the Service.  In any event, this

17   argument concerning an advisor's conflict of interest is subject to the same deficiencies discussed

18   above with regard to Reddam.

19   Third, Gonzales argues, for the first time in these proceedings, that his consents were

20   obtained under duress by IRS Agent Paul Doerr.  Gonzales claims that Doerr met with him twice

21   without his attorney present, interacted with him in an aggressive and intimidating manner, and left

22   the impression Gonzales might face jail time.  For example, Gonzales reports that Agent Doerr

23   drove from Sacramento to Gonzales's home in Nevada in order to serve a summons in July 2003

24   and again in October 2003.  According to Gonzales, Doerr's actions lead Gonzales to fear that if he

25   did not sign the waiver, he could and would be subject to criminal and civil penalties.  Gonzales

26   testified that this impression was based on Agent Doerr's words and actions, though he cannot recall

27

28

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    any specific threats or conversations.  The IRS disputes many of these claims, including the

2    suggestion that Doerr ever met with Gonzales without his attorney present.

3          Whether a taxpayer's consent to extend the statutory period was obtained under duress is a

4    subjective, fact-based inquiry not usually amenable to resolution on a motion.  *See, e.g., Stanley v.*

5    *Commission*, 81 T.C. 634, 637–38 (1983); *but see United States v. Toyota of Visalia*, 772 F. Supp.

6    481, 491 (E.D. Cal. 1991) *aff'd sub nom. United States v. Toyota of Visalia, Inc.*, 988 F.2d 126 (9th

7    Cir. 1993) (finding the government entitled to summary judgment as the taxpayer's evidence did not

8    amount to duress as that term has been defined in this context).  Here, the evidence presented by

9    Gonzales is insufficient to give rise to an inference of duress that would render his consent invalid.

10   Although Gonzales testified, repeatedly, that he was "afraid" of Agent Doerr and the IRS, he cannot

11   recall a single specific conversation or interaction in which Doerr threatened him with financial or

12   criminal penalties.  In fact, Gonzales testified that Doerr never threatened him with imprisonment;

13   rather, Gonzales's concern seems to have arisen because Doerr never affirmatively assured him he

14   would not face criminal penalties.  Gonzales also cannot recall any particular instances when Doerr

15   displayed an aggressive demeanor.  Indeed, Gonzales has no memory of any instance in which

16   Doerr implied that he might revoke the penalty waiver letter.  Gonzales Dep. 155:15–22.  A finding

17   of duress simply cannot reasonably arise solely from Agent Doerr's position as an agent of the IRS

18   or the fact that the Service might pursue lawful IRS action, even one that might result in serious

19   financial implications for the taxpayer.  On this record, Gonzales has failed to introduce any

20   evidence upon which a reasonable fact finder might conclude that his consent was obtained as a

21   result of duress.

22          c.   TMP Consent

23          As with Reddam, the government need not rely on Gonzales's individual consents to extend

24   the statutory period because it also obtained consents to extend from Presidio on behalf of the

25   partnerships.  Gonzales argues that the consents signed by Alan Smith on behalf of Presidio as the

26   TMP for Logan SIF to extend the statute of limitations are invalid because Smith did not have

27   authority to act on behalf of Presidio.  It is undisputed that Presidio converted from a partnership to

28

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    a single member LLC in December 2000 when one of its two remaining members, Norwood

2    Holdings, Inc., transferred its entire interest in Presidio to the other member, HSM Growth.[20]  The

3    record is not clear as to how Smith was named president of HSM Growth and whether he was duly

4    authorized to bind the LLC-2s as a representative of the TMP Presidio.[21]  It appears, however, that

5    the IRS reasonably relied on various representations from Presidio's counsel and other agents that

6    the entity was owned by HSM Growth, that Smith had been appointed president of HSM Growth,

7    and that Smith was therefore authorized to sign documents on behalf of HSM Growth and Presidio

8    as TMP for the LLC-2s (including both Foraker SIF and Logan SIF).

9    Under both California and Delaware law, if a principal represents that an agent has the

10   authority to bind the principal and a third party reasonably relies on that representation, the principal

11   is bound regardless of whether the agent actually had authority.  *See, e.g., Billops v. Magness Const.*

12   *Co.*, 391 A.2d 196, 198 (Del. 1978); *Assoc. Creditors' Agency v. Davis*, 530 P.2d 1084, 1100 (Cal.

13   1975).  Here, the LLC-2s, through general partner Presidio, held Smith out as their agent, and the

14   IRS reasonably relied on that representation.  While the corporate ownership structure remains

15   murky, Gonzales does not dispute that these representations were made or that the IRS reasonably

16   relied on those representations.  The fact that the IRS proceeded cautiously by obtaining redundant

17   consents from the taxpayers themselves does not negate this reliance.

18

19   _____

20   [20] In February 2000, Hayes Street assigned its 70% interest in Presidio to HSM Growth in exchange
     for one hundred shares of common stock of HSM Growth.  Munk. Decl. Ex. 20.  In December 2000,
     Norwood sold a 15% interest in Presidio to HSM Growth.  Munk Decl. Exs. 19, 22.  Norwood then
21   transferred its remaining 15% interest to HSM Growth, converting Presidio into a single member
     LLC, wholly owned by HSM Growth.  HSM Growth stopped paying annual franchise taxes to
22   Delaware after its 2002 year, and its charter was dissolved on March 1, 2004.  Larson and Pfaff
     continued to control Presidio, but Larson testified before the IRS that he did not know who the
23   owners of HSM Growth or the officers of HSM Industries were.  *See* Grande Decl. Ex. 62, Larson
     Dep. 46, 48, 57.
24   [21] Beginning in 2003, as the IRS continued its investigation of the BLIPS transactions, the IRS
     sought to determine who had authorization to sign statute extensions on behalf of Presidio.  Larson
25   had executed a power of attorney to the law firm Latham & Watkins, first for Presidio Advisory and
     then for the SIFs.  Munk Decl. Exs. 33, 34.  An attorney from Latham & Watkins told the IRS that
26   Odd Eckholt was the ultimate beneficial owner of Presidio.  Supp. Gee Decl. Ex. R.  Bruce Lemons,
     counsel for Presidio, represented to the IRS that Alan Smith had been appointed president of HSM
27   Growth by Eckholt and was therefore authorized to act on behalf of Presidio.  Questions remain,
     however, concerning the corporate structure.

28

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

30

"The standard for determining the validity of an FPAA is whether the FPAA provides adequate or 'minimal' notice to the taxpayer that respondent has finally determined adjustments to the partnership return." *Triangle Investors Ltd. P'ship v. Comm'r.*, 95 T.C. 610, 613 (1990). Assuming, without deciding, that Presidio had lost its authority to serve as TMP prior to the issuance of the FPAA, the generic FPAA sent to the address on record for Logan meets the minimal notice requirement. *See Chomp Associates v. Comm'r.*, 91 T.C. 1069, 1073 (1988) ("We agree that there must be adequate notice.  However, section 6223 does not require that a specific TMP be enumerated on the FPAA."); *Anderson v. United States*, C-91-3523 MHP, 1993 WL 204605 at *1 n.1 (N.D. Cal. June 3, 1993) *aff'd*, 50 F.3d 13 (9th Cir. 1995).  There is no question Gonzales and Logan received notice of the pending readjustment.  Indeed, they timely filed a petition for readjustment within ninety days.  On this basis, Gonzales's motion for summary judgment must be denied and the government's corresponding motion for summary judgment granted insofar as Gonzales is not entitled to a statute of limitations defense in this partnership proceeding.

## V.  CONCLUSION

For the reasons stated above, the government's motion for summary judgment against petitioners is granted on the basis that the BLIPS transaction lacked economic substance and therefore should be disregarded for tax purposes.  The government is further entitled to a judgment that the accuracy-related penalties for substantial valuation misstatements is applicable at the partnership level and that the LLC-2s constituted tax shelters as defined in the relevant regulation. The motions for summary judgment by intervenors are denied and the government's motion for summary judgment against intervenors is granted.

The government is not, however, entitled to a finding that the negligence misstatement penalty applies as a matter of law.  This finding does not preclude the government from seeking such a penalty at any subsequent partner-level proceeding, although a determination that the general partner Presidio was negligent is an appropriate inquiry for a partnership-level proceeding.  If the government wishes to pursue this issue further in this proceeding, it must notify the court by August 31, 2014, of its election and provide the court with a letter brief setting forth the justification and

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

31

1  legal basis to do so.  Petitioners will then be provided with an opportunity to respond, if necessary.

2  If no election is filed on or before that date, judgment will be entered in favor of the government, as

3  set forth above, and the case will be closed.

4         IT IS SO ORDERED.

5

6  Dated: July 31, 2014

7                                                    RICHARD SEEBORG
                                                     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

No. 04-cv-04264-RS
ORDER RE. MOTIONS FOR SUMMARY JUDGMENT

32